# MORTON ROBERT BOONE *v.* STATE OF MARYLAND

[No. 1285, September Term, 1975.]

*Decided September 17, 1976.*

2

The cause was argued before MOYLAN, MOORE and MASON, JJ.

*William F. Mosner* for appellant.

*Albert Gallatin Warfield, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew Sonner, State's Attorney for Montgomery County,* and *Steven A. Shaw, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Morton Robert Boone, was convicted in the Circuit Court of Montgomery County by a jury, presided over by Judge David L. Cahoon, of murder in the second degree and a violation of the handgun law. Because of obviously extenuating circumstances, factually if not legally, the jury gratuitously added to its verdict a recommendation of mercy. The judge sentenced the appellant to a term of ten years for the second-degree murder and then suspended five years of that ten-year sentence, for an effective sentence of five years. This tragic killing arose out of irreconcilable antipathies as to life-style between members of the same family.

The appellant was a successful 52-year-old businessman who enjoyed an excellent reputation with his friends and business associates and lived with his wife in Gaithersburg, Maryland. His daughter Sharon had in 1967 deserted her first husband and her child and had run off to Florida with the murder victim, Richard Bryant. Richard and Sharon were subsequently married and had one child. They adopted a hippie style of life, living in communal surroundings, maintaining an unkempt appearance, having no permanent residence or occupation and being heavily involved in the use of drugs. In the fall of 1974, they moved north with a fellow

traveler, Clayton Jester. After some emotionally charged negotiations, Sharon and Richard Bryant, along with Clayton Jester and the Bryant baby, then aged two, moved in with Mr. and Mrs. Boone. The three houseguests maintained a dirty and unkempt way of life, irregular hours and the use of marijuana while at the home of Mr. and Mrs. Boone. The final explosion came during dinner on September 23, 1974. When the child continued to misbehave at the table, Mr. Boone suggested to his daughter that it was time she taught the baby some manners. Sharon took the baby from the table and went into the living room. At that point, Richard Bryant initiated what became a violent argument with his father-in-law, in the course of which he protested that he would not have his daughter conform to the accepted rules of society, that the daughter would not attend school and that the daughter would not be brought up to conform to the rules of a capitalistic society. The appellant, Mr. Boone, countered that he would make it his business to see that his granddaughter did attend school. He criticized Bryant for his attitude concerning the government and offered the observation that the taxpayers were supporting Bryant and others like him. The intensity of the argument grew. Ultimately, the appellant, Mr. Boone, ordered Bryant and the others out of the house immediately. Bryant jumped up, assumed a fighting pose, and threatened to "paste him all over the wall" before he left the house. At that point, Jester also stood up and started to converge upon Mr. Boone. Mrs. Boone became frightened and moved into the kitchen.

The appellant, Mr. Boone, left the room and walked upstairs to his bedroom, where he kept a pistol. Jester followed Mr. Boone upstairs. According to Mr. and Mrs. Boone, this was a continuation of the aggressive pattern displayed below. According to Jester, it was simply an effort by Jester to get his clothes before leaving the house.

The undisputed facts of the case are that Mr. Boone returned downstairs with the gun and that Richard Bryant was fatally shot. The critical issue in the case is whether Mr. Boone shot Bryant deliberately or whether the gun went off accidentally. Jester was in another room and did not observe

the critical incident. According to Mr. Boone, he came downstairs with the gun "to make a show of force" so that the intruders would leave his house. He testified that Bryant unexpectedly reached out and grabbed his hand and that, in the ensuing struggle, the gun went off. Sharon, his daughter, testified quite to the contrary. She testified that she saw her father come down the stairs with the gun in his hand and that, without saying a word, he put the gun against Bryant's stomach and fired. The appellant, Mr. Boone, himself summoned the police and the ambulance. Bryant died on the operating table a few hours later.

The appellant's first contention is that the jury instruction on the subject of murder violated the dictates of *Mullaney v. Wilbur*, 421 U. S. 684, in that it did not fully articulate the burden upon the State to negate mitigation. Although noting that mitigation was not an issue in the case because the defense claim is that the pulling of the trigger was accidental, the dispositive answer to this contention is that this trial occurred on June 23 to July 1, 1975. *Mullaney v. Wilbur* was decided by the Supreme Court on June 9, 1975. As Chief Judge Murphy, specially assigned, made clear for this Court in *Squire v. State*, 32 Md. App. 307 (1976), defendants and defense attorneys are charged with knowledge of *Mullaney v. Wilbur* as of June 9, 1975, the day on which that opinion was issued. Indeed, in this very case, counsel for both the defense and the State were discussing *Mullaney v. Wilbur* at some length and laboring with the trial judge to frame an instruction within its guidelines. The instruction ultimately given was not objected to by the appellant. Md. Rule 756 f. The point now raised was, therefore, not preserved for appellate review. We decline to recognize as "plain error" under Md. Rule 756 g an alleged *Mullaney* violation where no objection was lodged at the time the instructions were given, when such failure occurs after June 9, 1975. *Squire v. State, supra.*

The appellant's second contention is that when a firearms expert was on the stand, the following hypothetical question and answer thereto should not have been permitted:

> "Q. Now assuming, if you will, that the gun, State's exhibit 27, was fired by a man holding it in his right hand, do you have an opinion on the effect upon the hand of another person grabbing the exposed portions of that gun?
>
> A. Mr. Wilder: The hand placed on the gun while it was being fired would show marks from the burned powder and burns from the hot escaping gases."

The coroner had testified that she did not see any burns or powder marks on the hands of the deceased. In view of the testimony of Mr. Boone that the deceased with both of his hands grabbed Mr. Boone's right hand with the gun in it, we think an adequate factual predicate was shown to support a hypothetical question. At one point in the cross-examination of Mr. Boone, the following testimony was elicited:

> "Mr. Shaw: Alright. When he grabbed your right hand, he didn't grab the gun?
>
> Mr. Boone: He did grab the right hand, the gun and all with both hands, Sir.
>
> Mr. Shaw: Well, was it the gun, or your hand that he grabbed?
>
> Mr. Boone: The gun is in the hand, Mr. Shaw. He grabbed both gun and hand."

Shortly thereafter, the further elaboration took place:

> "Mr. Shaw: You don't know whether he — well, did he touch your hands?
>
> Mr. Boone: Yes, he did.
>
> Mr. Shaw: And he also touched the gun?
>
> Mr. Boone: Yes, he did."

The general rule is that a hypothetical question must be based upon the facts in the case. *Allison v. State*, 203 Md. 1, 6; *Tull v. State*, 230 Md. 596, 603. We find the testimony here fully supportive of the hypothetical question.

The appellant's third contention is that the State in rebuttal should not have been permitted to rehabilitate the

credibility of State's witnesses Clayton Jester and Sharon Bryant by showing, through the police and police reports, prior consistent statements on their part. The general rule is that where the credibility of a witness has been impeached in such a way as to indicate that his present testimony may be a fabrication, prior consistent statements are admissible for rehabilitative purposes if they would tend to show that such consistency was present prior to the time of probable fabrication. *Harris v. State*, 11 Md. App. 658, 661; *Borza v. State*, 25 Md. App. 391, 410. In the present case, the defense opened the door to such rehabilitation by offering a defense witness, Dr. Hunter, who testified that individuals under the influence of marijuana — clearly referring to both Clayton Jester and Sharon Bryant — would have a tendency to be inaccurate in both perception of observed events and in later recall of those events. Inaccuracy in terms of perception at the time of the crime would have predated the giving of a report to the police and would make the police reports, therefore, irrelevant for rehabilitation purposes. Dr. Hunter's testimony, however, was also susceptible of the interpretation that what may have been clouded by the regular use of marijuana would be present recollection of those past events. The clear import would have been that the trial testimony was, of necessity, either a fabrication or an inaccurate recall. As to that possibility, the prior consistent statements were relevant rebuttal. We cannot, therefore, say that the trial judge abused his discretion in permitting this inquiry.

The appellant's final contention is that he was denied the opportunity in surrebuttal to rehabilitate his own credibility by calling witnesses who would testify to his reputation for truth and veracity. He misreads the law in this respect. Such rehabilitation is only permissible in rebuttal where his character or reputation for truth and veracity has been directly attacked. That which he argues was an impeachment of him in this case was simply State's evidence which controverted his position. This was not such an attack upon credibility so as to permit the type of rehabilitation here urged. *Vernon v. Tucker*, 30 Md. 456, 462; *Sloan v.*

*Edwards,* 61 Md. 89; *McLaughlin v. State,* 3 Md. App. 515.
As we held in *Hallengren v. State,* 14 Md. App. 43, at 50, n. 2:

> "The authorities are nearly unanimous in holding
> that the mere fact that a witness's testimony is
> contradicted by opposing testimony does not
> warrant the introduction of evidence as to his
> reputation for truth and veracity."

81 Am.Jur.2d, *Witnesses,* § 636, is squarely in accord with
this position:

> "The question as to when and under what
> conditions a witness may be corroborated by
> evidence of good character and reputation for truth
> and veracity is one that has been much discussed by
> text writers and jurists and upon which there are
> differences of opinion. There are, however, some
> established principles which pervade the
> adjudicated cases and upon which some general
> conclusions may safely be based. A presumption
> attends every witness that he is of good character;
> consequently, until his character has been attacked,
> evidence in support of his character is not
> admissible. On the other hand, where a witness
> has been impeached by an attack on his character
> or reputation for truth and veracity, proof of his
> good character or reputation for truth may be
> received to fortify his credit, whether the attack is
> by direct evidence or by cross-examination. Thus,
> some courts admit evidence of general reputation in
> support of a witness who on cross-examination or
> by record of conviction has been impeached by acts
> of immoral or criminal conduct. It has also been
> held that after specific acts of an adverse witness
> have been shown for purposes of impeachment, the
> party calling the witness may sustain his character
> by eliciting from him evidence explaining those acts
> or mitigating their effect, even though such
> evidence would not otherwise be admissible."

Of similar import is 81 Am.Jur.2d, *Witnesses*, § 639:

> "To warrant the admission of evidence of a witness' general character or reputation for truth and veracity in support of such witness, there must be some special or particular element introduced in the case by which such witness is impeached or discredited. It may be enough that the witness is impeached by his own contradictory statements. Generally, however, the authorities do not regard the contradiction of a witness by other witnesses as sufficient to justify the admission of testimony in support of the witness' reputation for truth, honesty, and integrity. Thus, where a defendant in a criminal case elects to testify in his own behalf, and where his credibility is not attacked, except by contradiction of his testimony, evidence sustaining his reputation for truth and veracity is not admissible."

We see no abuse of discretion by the trial judge in refusing to permit the calling of witnesses by the appellant in surrebuttal for purposes of rehabilitating his allegedly impeached credibility.

*Judgments affirmed; costs to be paid by appellant.*