624 A.2d 1257

**Ricardo BURKS**

v.

**STATE of Maryland.**

**No. 18, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

May 26, 1993.

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before MOYLAN, ALPERT and BLOOM, JJ.

MOYLAN, Judge.

The appellant, Ricardo Burks, was convicted by a Baltimore City jury, presided over by Judge Ellen L. Hollander, of two counts of second-degree murder and one count of the use of a handgun in the commission of a crime of violence. On this appeal, he raises the following eight contentions:

1. The evidence was not legally sufficient to sustain the convictions.

2. Judge Hollander erroneously refused to give an instruction on the law of manslaughter.

3. The judge erroneously permitted the State to introduce evidence of kidnapping charges having been filed against the appellant in Baltimore County.

4. The judge erroneously failed to grant a mistrial due to prosecutorial misconduct.

5. The judge erroneously failed to grant the appellant's motion to suppress physical evidence.

6. The State was erroneously permitted to make an improper closing argument.

7. The judge erroneously admitted irrelevant hearsay evidence from Sergeant Spanos.

8. The docket entries improperly reflected the sentences actually imposed upon the appellant.

### Legal Sufficiency of the Evidence

The appellant's first contention is that the evidence was not legally sufficient to have permitted the case to be submitted to the jury. We disagree. As we begin our analysis, we note the two fundamental flaws in the appellant's argument. The first is his mistaken belief that this was a case where the State's proof consisted of "circumstantial evidence alone," thereby invoking such cases as *West v. State,* 312 Md. 197, 539 A.2d 231 (1988) and *Wilson v. State,* 319 Md. 530, 573 A.2d 831 (1990). In this case, there were damaging admissions from the appellant himself. In this case, the appellant was found in possession of the guns that checked out ballistically to have been the murder weapons. In this case, there was the fact

that the appellant led the police to where three murdered bodies had been hidden. In no sense was this case one where the evidence of guilt consisted of "circumstantial evidence alone."

We agree with the appellant that a significant part of the proof of his criminal agency came from his own statements to the police and from his own testimony. Those statements were inculpatory in part and exculpatory in part. The second fundamental flaw in the appellant's argument is his mistaken belief that the jury is required either to accept his statements *in toto* or to reject them entirely. That is by no means the law. The jury was fully entitled to believe those parts of the statements that were incriminating (admissions and declarations against interest have special indicia of reliability) and to disbelieve the self-serving parts of the statements that were exculpatory. There is no all-or-nothing principle involved, and the fact finder enjoys the full prerogative of being selective.

Taking that version of the evidence most favorable to the State's case, the jury could have found that the appellant went to the home of his brother-in-law, Marvin Willis, at 441 Yale Avenue during the early morning hours of Friday, April 19, 1991, in search of cocaine. The two men went to the basement to "freebase" cocaine. When they ran out of the drug, they left the home to buy more and then returned. This pattern of buying cocaine and then returning to Willis' basement and freebasing the drug occurred three times.

At some time during the early morning hours, they were joined at Yale Avenue by Derrick Newman, Joseph Austin, and Charles Jefferson, three of the ultimate four murder victims. Newman, Austin, and Jefferson were known cocaine dealers on Yale Avenue. At some time after entering Yale Avenue and going down to the basement, Newman, Austin, and Jefferson were all murdered. Austin died of multiple gunshot wounds, one of which was a contact wound to the head. Jefferson died of two gunshot wounds to the head. The autopsies revealed that both Austin and Jefferson had unusually high levels of morphine in their blood, indicating a heroin injection. There was no evidence, such as needle

marks or "track marks," to indicate that either Austin or Jefferson had been regular or long-term heroin users. The Deputy Chief Medical Examiner testified that the amount of narcotics in the two individuals would have rendered them unconscious almost immediately and would likely have resulted in their deaths had they not been shot first.

The third victim, Newman, showed no narcotics in his body. He suffered forty-six stab wounds, and several blunt-force injuries and died of a contact gunshot wound to the head. The weapon that inflicted all three execution-style gunshot wounds to the head was a 9 mm. handgun. According to the appellant, the 9 mm. handgun belonged to Willis. When the appellant was arrested in Howard County several days later, however, the 9 mm. handgun was in his possession.

By his own admission, the appellant was present when Newman, Austin, and Jefferson were murdered. According to his version of the events, he was merely a terrified spectator to the murders. The jury, however, was fully entitled to accept his admission that he was present in the basement at the time of the killings but to reject utterly his explanation of his role. The appellant was acquitted of having murdered Austin and Jefferson. He was convicted of the second-degree murder of Newman.

It was apparently during the early morning hours of Saturday that the appellant and Willis decided that they would have to dispose of the three bodies in the basement. They borrowed a truck belonging to a cousin of Willis, wrapped the three dead bodies in some carpeting, and dumped the bodies in an isolated area in the vicinity of the Baltimore–Washington International Airport. The appellant subsequently led the police to the spot where the bodies were hidden.

Returning to Yale Avenue, the appellant and Willis began to argue with each other. In the last analysis, Willis died of multiple gunshot wounds. Although the appellant claimed that he had to wrestle a gun away from Willis and kill in self-defense, one of the lethal shots was to the back of Willis' head at close range. Willis suffered a total of five gunshot wounds.

In addition to the bullet to the back of the head, Willis received one gunshot wound in the upper front chest. The remaining wounds, on the other hand, indicated that Willis was in flight from the appellant. One was to the back of the left chest, another was to the back left shoulder, and yet another was to the left buttock. The appellant was not wounded at all.

After having killed Willis, moreover, the appellant did not summon the police to report a necessary killing in self-defense. Indeed, he lied to his own wife, Cynthia Burks, and to Willis's girlfriend, Jackie Parran, telling them that Willis was still in the Yale Avenue house and passing on messages to them from Willis at a time when Willis was already dead.

By Saturday night, the appellant determined to flee. He took the 9 mm. handgun, which he claimed had belonged to Willis, and a .38, which he claimed had belonged to one of the first three murder victims, and took them with him. He also stole Willis's car. Later that night, he abandoned the car but he kept the two guns. They were with him the following morning when he kidnapped Eric Cada and Kimberly Gold-scher and commandeered their car.

█ The evidence was ample to support the convictions. With respect to the killing of Willis, the appellant was admit-tedly the homicidal agent. He directed a dangerous and deadly weapon not once but five times at vital parts of Willis's anatomy. That, five-fold, is an adequate predicate from which the jury may infer the intent to kill. The jury was entitled to disbelieve utterly his story of self-defense. Having done so, the jury's verdict of guilty of murder followed naturally.

█ With respect to the murder of Derrick Newman, the evidence clearly permitted the rational inference that the appellant was, at the very least, one of the two participants in that murder. His participation in the hiding of the bodies was itself a significant indication that he was a guilty participant and not a terrified spectator. We see no error.

### *The Defense Burden of Production: Generating*
### *a Genuine Issue As To Mitigation*

The appellant's second contention is that Judge Hollander erroneously failed to instruct the jury on the crime of manslaughter with respect to the homicide of Derrick Newman. The contention will not prevail for two reasons. In the first place, it has not been preserved for appellate review. Even if it had been preserved, however, there is utterly no merit to it.

We must keep in mind the clear distinction between the killing of Derrick Newman during the early morning hours of Friday, April 19 and the killing of Marvin Willis approximately thirty-six hours later on Saturday, April 20. With respect to the Saturday killing of Marvin Willis, the appellant testified that he killed in self-defense. Accordingly, he was entitled to a jury instruction on the subject of manslaughter. The sub-variety of mitigation that might arguably have been available was, of course, that of imperfect self-defense. The judge fully instructed the jury on manslaughter of the imperfect self-defense variety with respect to the killing of Marvin Willis. There is no challenge to the jury instructions in that regard.

Judge Hollander, however, gave no manslaughter instruction with respect to the killings of Newman, Austin, or Jefferson because the evidence had generated no genuine jury issue of mitigation with respect to any of those killings. At the conclusion of the instructions, she asked whether there was anything that she had forgotten. The appellant's counsel replied simply, "I don't recall." When the judge then asked whether there were any exceptions, the appellant's counsel excepted specifically 1) to the first-degree murder instruction, 2) to the instruction regarding inferences that may be drawn from circumstantial evidence, and 3) to the judge's use of the word "rage" rather than "passion" in the manslaughter instruction with respect to the killing of Willis. There were no other exceptions.

A subsequent discussion did occur with respect to the sheet submitted to the jury containing possible verdicts. It did not contain a manslaughter verdict for the charges involving the

killings of Newman, Austin, and Jefferson. It was the judge who brought this to the attention of counsel. In the most equivocal of fashions, appellant's counsel requested that that possible verdict be submitted to the jury:

"The Court: There is no contention of hot blood.

"Defense Counsel: Well, I mean, it is borderline, that the other had the gun ... We are going to request manslaughter. ..."

Judge Hollander reminded appellant's counsel that she had earlier agreed that there was no case generated to support any manslaughter theory with respect to the killings of Newman, Austin, and Jefferson:

"The Court: ... you [defense] told me you didn't see manslaughter involved in the first three in the basement and I was trying to find out what it is that made you change your mind now."

The judge let the verdict sheet stand.

During the course of its deliberations, the jury sent out a note requesting reinstruction on the subjects of murder, manslaughter, and self-defense. Once again, the judge made it clear that the manslaughter reinstruction had reference only to the killing of Marvin Willis. Before sending the jury back to resume its deliberations, she asked whether "counsel has anything else they would like me to give." Appellant's counsel did not object to the reinstructions as given and as limited. We hold that the issue the appellant now raises was not timely raised below and has not been preserved for appellate review. Md.Rule 4–325(e); *Dawkins v. State*, 313 Md. 638, 642–643, 547 A.2d 1041 (1988).

Because of the length of this trial and the vast judicial resources that have already been expended to bring it to its present state of resolution, we will now do something that we are not ordinarily disposed to do. Notwithstanding our holding that this issue has not been preserved for appellate review, we nonetheless make the express and fully considered alternative holding that even if this contention had been preserved for appellate review it could not prevail on the merits. With

respect to the killing of Derrick Newman, the evidence did not generate any genuine jury issue of hot-blooded provocation and a jury instruction on that theory of manslaughter, urged by the appellant, would have been absolutely improper.

■ Only one person now alive witnessed the killings of Newman, Austin, and Jefferson. That is the appellant. Only one person has any knowledge as to what was in the mind of the appellant at the time of the killings of Newman, Austin, and Jefferson. That is the appellant. The appellant's testimony in that regard is the only direct evidence introduced in this case on that subject. The appellant testified unequivocally that he did not participate in any way, as a first-degree principal or as an aider and abettor, in the killings of Newman, Austin, and Jefferson.

The appellant's present theory that he killed Newman in hot-blooded response to the legally adequate provocation of a mutual affray is pure lawyerly speculation as to what *might* have occurred. A genuine jury issue, calling for instructions, requires supporting evidence, not mere speculation. Even if the evidence could arguably have supported a permitted inference of a mutual affray, there was not the remotest suggestion in the evidence 1) that such arguable provocation generated any "heat of passion" in the appellant or 2) that the appellant deliberately killed Newman in passionate response to that provocation.

The mitigation theory of hot-blooded response to the legally adequate provocation of a mutual affray fails in this case for the same reason that a mitigation theory of hot-blooded response to the legally adequate provocation of discovering a spouse in an act of adultery failed in *Bartram v. State*, 33 Md.App. 115, 175, 364 A.2d 1119, 1153 (1976), *aff'd*, 280 Md. 616, 374 A.2d 1144 (1977):

"Mitigation, moreover, was not a legitimate jury issue in this case. In the circumstances of this case, only the appellant could have injected evidence as to an intentional but hot-blooded killing. She, however, stoutly maintained that the killing was suicidal.

... It is hornbook law that if one spouse discovers another in an unexpected act of adultery, a killing of spouse or paramour in hot-blooded fury may lower the blameworthiness from the murder level to the manslaughter level.

The blood, however, must indeed be hot and, generally speaking, only the hot-blooded killer can attest to that." (citations omitted).

The appellant here failed utterly to meet his burden of production. The evidence was nonexistent, let alone legally sufficient, to generate a genuine jury issue as to manslaughter. The judge properly refrained from giving an extraneous instruction on an extraneous subject. *Brown v. State,* 29 Md. App. 1, 19–20, 349 A.2d 359, 370 (1975); *Blake v. State,* 29 Md.App. 124, 130, 349 A.2d 429, 433 (1975); *Stambaugh v. State,* 30 Md.App. 707, 709 n. 1, 353 A.2d 638, 640 n. 1 (1976); *Boone v. State,* 33 Md.App. 1, 3–4, 363 A.2d 550, 552–553 (1976).

### The "Reasonable Hypothesis of Innocence" And All That

The appellant also took passing exception to the instructions in the following regard:

"If the circumstances make one inference just as reasonable as the other, you must give the defendant the benefit of the conclusion that would mitigate his guilt."

That instruction was perfectly proper and we see nothing wrong with it. The appellant's objection is that it did not employ the precise language used by the Court of Appeals in *West v. State,* 312 Md. 197, 539 A.2d 231 (1988). It is of no consequence. The language used was just as good. *West,* moreover, was a case discussing the legal sufficiency of evidence, which is an issue exclusively for trial and appellate judges, and has nothing to do with jury instructions. *Hebron v. State,* 92 Md.App. 508, 608 A.2d 1291, *cert. granted,* 328 Md. 462, 615 A.2d 262 (1992).

### The Relevance of Flight

The appellant's third contention is that the court erroneously permitted the State to introduce evidence regarding the

kidnapping of Eric Cada and Kimberly Goldscher. We will recapitulate briefly the connection between the murders and the kidnapping. Everything occurred over the course of the weekend that ran from Friday, April 19 through Monday, April 22. It was early on Friday morning that the appellant participated with Marvin Willis in the killing of the first three victims in the basement of 441 Yale Avenue. It was late that Friday night or early on Saturday, April 20, that the appellant and Willis disposed of the bodies of the three victims in Anne Arundel County. It was either Saturday afternoon or Saturday evening when the appellant shot and killed Marvin Willis, on whom he subsequently placed all of the blame for all four killings, including Willis's own. On Saturday night, the appellant took and then disposed of Willis's car.

Between Saturday night and early Sunday morning, April 21, the appellant found his way to Baltimore County. It was in Owings Mills at approximately 7:00 A.M. that Sunday morning that he kidnapped, at gunpoint, Eric Cada and Kimberly Goldscher. They remained in his presence all day during an odyssey that took them first as far south as the vicinity of Richmond, Virginia, and ultimately wound up late Sunday night in the Terrace Motel in Howard County. During that odyssey, the appellant had a great deal to say about his flight from justice and about the various options for flight that he considered before deciding upon the kidnapping. When the appellant was arrested at approximately 1:30 A.M. on Monday morning, April 22, he was carrying two handguns, which checked out ballistically to be the murder weapons. Indisputably, the events of Sunday and early Monday morning threw relevant light on the events of Friday and Saturday.

The appellant acknowledged at trial, as he does on this appeal, that flight is relevant evidence as an indication of a sense of guilt. The appellant, however, moved *in limine* to preclude the State from offering any evidence of the kidnapping at all. The appellant was willing to stipulate to the disembodied conclusory fact that the appellant, for twenty-four hours, had fled the jurisdiction but insisted that that fact

be left disembodied and not fleshed out with any surrounding detail.

■ The State, for its part, was salivating for the introduction of every lurid detail. The court eschewed both extremes and undertook to navigate, detail by detail, the difficult course between Scylla and Charybdis. In the course of doing so, she took initially as her guiding stars 1) the fact that evidence of flight is admissible to show consciousness of guilt, *Hunt v. State,* 312 Md. 494, 540 A.2d 1125 (1988); *State v. Edison,* 318 Md. 541, 569 A.2d 657 (1990), and 2) the fact that the sober and intelligent reasoning pattern and the articulate speech pattern of the appellant during the kidnapping odyssey would be very relevant if the jury were later asked by the appellant to conclude that a subsequent statement made by him was involuntary because he was too intoxicated and otherwise "frazzled" to understand what he was doing.

The State was asked to submit a precise list of those particular details of the odyssey it sought to introduce. The judge carefully ruled that certain of them were admissible and others were inadmissible. The defense then made a *dramatic* strategic decision. It agreed to forego arguing to the jury the involuntariness of the appellant's statement to the police. Accordingly, she reevaluated her tentative admissibility rulings. With a single guiding star left available, less details were deemed to be relevant and admissible. Throughout this process, the trial judge made careful and thoughtful assessments and evaluations. On evidentiary rulings of this sort, the appellate court will not presume to second-guess the trial judge or overturn her decisions unless there has been a clear abuse of that wide discretion necessarily vested in the trial judge. We see no such clear abuse in this case.

■ The type of detail that was admitted in evidence included such things as 1) the appellant's telling his victims that he had escaped from prison and that the two guns had been given to him by a friend, 2) the appellant's explaining what his "options" for escape were, rejecting the option of an airplane, for instance, because he could not carry his guns with him, 3)

the appellant's advising his victims to help him look for a van to steal because the Jeep would have been by that time getting "hot," and 4) the appellant's considering and rejecting various alternative means of getting away.

It is unnecessary for us to analyze in any further detail the carefully tailored rulings made in this regard. The appellant has not referred to any of the more particularized rulings and has not cited any legal authority with respect to them. The appellant is apparently content to make the general argument that the disembodied fact of flight was admissible but that nothing else that was done or said in the course of the kidnapping was admissible in any way. We reject, as did the trial court, that sweeping and undifferentiated attack on admissibility. Certain things that the appellant said and did during the course of the kidnappings were admissible. It is not necessary to hold more. Since the appellant has not seen fit to "fine-tune" his complaint, it is unnecessary for us to "fine-tune" our analysis any further as to precisely what was admissible and what was not.

One final note, however, is appropriate on the subject of flight. The notion that "flight is relevant as evidence of consciousness of guilt" rolls so trippingly from the tongue that it has regretfully been reduced to little more than a cliche. It behooves us to give it a moment of more serious contemplation. There are varying degrees of conduct that would qualify as flight. The escalation of such flight would logically give rise to a corresponding escalation of the strength of the inference that might flow from it. Getting into a car and driving from Baltimore to New York, for example, would be a more significant instance of flight than merely walking across the street away from the scene of a crime. Hijacking a plane to Cuba to avoid detection and/or arrest would obviously be a yet stronger case with a potentially greater inference of guilt that might be generated.

In this case, the kidnapping of two innocent persons, the commandeering of their car, the keeping of them hostage for approximately eighteen hours, and the transporting of them from Baltimore County to the outskirts of Richmond and then

back to Howard County is a circumstance more akin to an airplane hijacking than to walking away from the scene of a crime. The aggravating circumstance of the kidnapping strengthens the inference that might be drawn from this particular instance of flight and argues for admissibility on that basis alone.

### The Purpose of a Declaration of Mistrial: Remedial, Not Prophylactic

The appellant's fourth contention is that the court erroneously failed to grant a mistrial after the prosecutor asked a question that the prosecution had apparently assured all parties would not be asked. As we approach our analysis of this contention, we point out that the focus is not on whether the prosecutor was guilty of an impropriety or even whether the prosecutor was guilty of a deliberate and flagrant impropriety, but only on what the appropriate sanction should be. The judge agreed with the appellant that an impropriety had indeed occurred and promptly gave a curative instruction. She did not believe, however, that sufficient prejudice had occurred to merit the extreme sanction of a mistrial. We hold that she did not abuse her discretion in that regard. A mistrial is not a sanction designed to punish an attorney for an impropriety. It is rather an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice.

■ Prior to trial, defense counsel inquired as to whether the prosecutor intended to use any prior convictions in an effort to impeach the appellant's credibility should the appellant elect to testify. The prosecutor responded that he was not aware of any impeachable offense that could be used for such a purpose. The court cautioned the prosecutor that he should approach the bench before asking any questions with respect to impeachable offenses. Again, at the close of the State's case, while the appellant's counsel was advising the appellant of his right to testify, inquiry was again made of the prosecutor as to whether he had any impeachable offenses

that he would try to introduce. The prosecutor responded, "None that I'm aware of." The appellant elected to testify. The first question posed on cross-examination was:

"Now, Mr. Burks, you have been found guilty in Baltimore County of two counts of robbery with a deadly weapon?"

Defense counsel immediately objected and moved for a mistrial. At a hastily summoned bench conference, the judge roundly upbraided the prosecutor for having misled both defense counsel and the court. It may be that there was a genuine problem of miscommunication. The prosecutor stood by his grounds that there was nothing impeachable in the appellant's "prior record" but did not interpret the kidnapping convictions in Baltimore County, arising contemporaneously out of the same larger criminal episode, as falling within the category of something "prior." The judge continued to chastise the prosecutor's judgment as "truly ill-advised." She promptly gave the following curative instruction:

"The Court: Members of the jury, I am going to sustain that objection. That means you must disregard the question and there was, I think, not enough time for any answer. Members of the jury, when I sustain the objection and tell you that you must disregard something, it means that you may never consider it, not now and at any time during the deliberation process.

Mr. Burks is not on trial in this court for what happened in connection with the kidnapping and that is, therefore, my instruction to you, that you must disregard it in that context."

Even assuming the worst, however, with respect to prosecutorial intentions, the court did the correct thing. She recognized that the decision as to whether a mistrial is called for is contingent upon the impact of an error and not upon the motivation behind the error. We assess reversible error as did the Court of Appeals in *Johnson v. State*, 325 Md. 511, 517, 601 A.2d 1093 (1992):

"We ascribe no nefarious intention on the part of the prosecutor, but *it is the impact of his comments on the jury that is significant, not his intent.*" (emphasis supplied).

The appellant, on the other hand, seems so obsessed with the allegedly deliberate character of the error that he almost neglects the more important consideration of prejudice. If it were, indeed, believed that a prosecutor had perpetrated a deliberate foul, there are sanctions enough available for that: 1) a complaint to the supervising State's Attorney himself, 2) a verbal reprimand, 3) a citation for contempt, 4) referral to a grievance committee. The declaration of a mistrial, on the other hand, is not designed to serve a prophylactic or reprimanding function. Nor is there any necessary correlation between the egregiousness of an error and the impact of that error. Even an innocent and inadvertent error may occasion great prejudice, calling for a mistrial. Conversely, the most deliberate and flagrant of errors may give rise to significantly less prejudice, thereby not necessitating the extreme sanction of a mistrial.

The judge noted that the jury was already fully apprised of the fact that the appellant had kidnapped Eric Cada and Kimberly Goldscher. She concluded that the jury almost certainly knew that a weapon had been involved in the commission of the kidnappings. The testimony was, of course, that two guns were recovered from the appellant as he was arrested in the act of holding his victims hostage in the Howard County motel. The evidence that he had forced Eric Cada to use his credit card gave rise to the reasonable inference that he had taken control of his kidnap victim's property by force or threat of force.

It is to be noted, moreover, that the prosecutor's improper question was never answered. When defense counsel continued to harp upon the prosecutor's bad faith, Judge Hollander responded, "Not every prejudicial error by a prosecutor requires the declaration of a mistrial." The trial judge, who was in the best position to assess the relative impact of the question, concluded that irreparable and irremedial harm had not occurred and that the curative instruction should suffice. It was of this superior coign of vantage that the Court of Appeals observed in *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707 (1974):

"In considering whether, in the first instance, any of the remarks attributed to the prosecutor had the effect of unfairly creating prejudice against the defendant, recognition must be given to the fact that the trial judge, who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and assess—in the context in which the remarks are made and their relationship to other factors in the trial—whether they were in fact prejudicial."

Recognizing that this is the type of question that classically is entrusted to the wide discretion of the trial judge, *Lusby v. State,* 217 Md. 191, 195, 141 A.2d 893, 895 (1958); *Basiliko v. State,* 212 Md. 248, 260–261, 129 A.2d 375, 381 (1957), we cannot say that there was any clear abuse of discretion in this case in determining that the extreme sanction of a mistrial was not imperatively called for.

## The Suppression Motion

The appellant's fifth contention is that Judge Hollander erroneously failed to grant his suppression motion. The suppression motion was aimed at 1) several guns that were recovered when the police crashed into a Howard County motel and arrested the appellant, 2) a statement that the appellant subsequently gave to Baltimore City police officers, 3) the fact that the appellant directed the police to where three bodies were buried, and 4) evidence with respect to those three bodies.

### 1. The Warrantless Entry Into the Motel Room:

The entry into the Howard County motel room and the arrest of the appellant resulted from an investigation being conducted by Sergeant C.A. Spanos of the Howard County Police Department into the disappearance of two persons, one of whom was a resident of Howard County. After he shot and killed Marvin Willis in Baltimore City, the appellant took the keys to Willis's car, then took the car itself, and began driving. He abandoned the car in downtown Baltimore and began walking. He somehow wound up in Owings Mills (presumably

by subway). It was there that he encountered Eric Cada and Kimberly Goldscher and kidnapped the two of them at gunpoint. It was the disappearance of Mr. Cada and Ms. Goldscher that triggered an investigation both in Baltimore County and in Howard County.

Turning to the information available to Sergeant Spanos, he had been informed of the disappearance of the two persons and spoke to the parents of both. He also spoke to the roommate of Mr. Cada. He learned that Mr. Cada was a 24–year-old white male who worked as a C.P.A. for one of the larger accounting firms in the Baltimore–Washington area. Mr. Cada was characterized as a highly professional young man, as well organized, and as a planner. He was very close to his roommate, who also worked in accounting. The roommate knew that Mr. Cada had a very important business appointment in New York on Monday morning and was planning to take the train to New York from Baltimore City.

Mr. Cada was described, moreover, as a young man with "money, a steady income" and as one who "enjoys nice things, nice places." His girlfriend, Kimberly Goldscher, with whom he had an ongoing relationship, had stayed with him over the weekend at his home in Columbia. It was described as "an expensive townhouse" that was "very well kept and furnished." Mr. Cada was described as having "a work ethic." He "always went to work or showed up for work or made a phone call telling people where he was and what he was doing."

On the Sunday morning when they disappeared, Mr. Cada was supposed to take Ms. Goldscher to her job at a health club in Baltimore County and then to "come right home and prepare for the business trip." He did not return home. She did not show up at work. The roommate testified that "nothing had been packed for an extended stay for being away for that day or overnight." The failure of Mr. Cada to return home and prepare for his business trip was characterized as bizarre. He had been making mental and physical preparations for it for a week. It was extremely unusual for him not to return home and not to pack his clothes and not to go over

the information with his roommate that he was going to need for his Monday appointment.

The mother of Ms. Goldscher informed Sergeant Spanos that her daughter had not reported for work on that Sunday. That conduct was described as highly unusual. The mother explained that if her daughter "wasn't going to be at work for some reason if she is sick or some other reason, she always called work." The daughter also was described as someone "who basically liked nice things" and "stayed in nice places." The mother informed the Sergeant that "this had never happened before where she never called her family if something was wrong."

Sergeant Spanos concluded that "something afoul had probably gone wrong." The area hospitals were checked to no avail. Mr. Cada's roommate had full access to his credit card numbers and they were checked. It turned out that Mr. Cada's credit cards had been used, first in Virginia and then in Maryland. At 3 P.M. on Sunday afternoon, the credit card had been used at a gasoline station near King's Dominion in Virginia. At 8:30 P.M. that evening, it was used at a motel in Arbutus. When Sergeant Spanos discovered the location of the motel, he described it as a "cheap motel" that frequently rented rooms simply by the hour. It would not have been a likely spot for Mr. Cada and Ms. Goldscher to have checked in for several reasons. In the first place, it clearly would not have suited the tastes of either of them. In the second place, it was only a few minutes' drive from Mr. Cada's expensive townhouse in Columbia, which was readily available to the couple. The cheap motel simply made no sense and tended to confirm Sergeant Spanos' suspicion that foul play might have occurred.

Because the credit card check only put them in the general area, several motels had to be checked out. When the police arrived at the Terrace Motel, they spotted a Jeep matching precisely the description of Mr. Cada's vehicle. Apparently, three persons had checked into Room 23, using Mr. Cada's credit card. Sergeant Spanos was able to look into the room through a narrow gap in the curtains. The light was on, and

someone was lying face-down on a bed directly in front of the window. On the other bed were a man and a woman. The woman was a white female. The two were fully clothed, lying on top of the covers and appeared to be asleep. A pass key was obtained from the motel clerk. The police team was alert for an emergency entry. Opening the door with the pass key, Sergeant Spanos discovered that the door was chained. He immediately kicked it in and entered.

His rationale for making a warrantless entry into the room based upon his belief that exigent circumstances were present was well summarized in his testimony at the suppression hearing:

"Well, with all of the information I obtained on the two people that had been reported missing and my fear of foul play, finding a third person in the room, the use of the credit cards, I mean, they lived maybe fifteen, twenty minutes from that area via the highway. There was no reason for these two people to go into, for better terminology, a motel that was used for sex or just to spend the night in a very cheap motel room. For that reason, for the information gathered from the people during the day in reference to their character and where they had been, what his business was that morning, there was no reason for him to be there, no practical reason for a reasonable person to believe why he would spend the night there.

I had a fear for the safety of the two people I was looking for and the only one that I could really recognize from the description was the female laying on the bed and she was supposed to have been at work that day and she had no contact with the parents so I had fear for her safety."

### a. Fourth Amendment Applicability: The Threshold of Standing to Object

In his suppression motion, the appellant claimed that the warrantless entry of the Howard County police into the motel room where he was arrested was unreasonable and, therefore, violative of the Fourth Amendment. The court ruled that the appellant had no standing that would entitle him to litigate the

Fourth Amendment merits of the entry. We fully agree. Room 23 of the Terrace Motel was rented for the night by Eric Cada. The room was paid for with Mr. Cada's credit card.

■ Traditionally (*i.e.*, before 1960), Fourth Amendment standing to object to the entry into or search of a place was extended only to those who had a possessory or other proprietary interest in that place, by way of owning it, leasing it, etc. *Cecil Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Clearly, the person with the proprietary interest in Room 23 was Eric Cada, not the appellant. The appellant, therefore, lacked any traditional standing in Room 23.

*Jones v. United States*, however, liberalized the law of standing in 1960 by creating what has generally come to be known as derivative standing. It is in a sense a "junior varsity" variety of Fourth Amendment protection that extends (derives) through the host to all of those legitimately on the premises as the *bona fide* guests, licensees or invitees of the host.

The appellant fails abjectly to qualify for such derivative standing. In the first place, he was not *legitimately* on the premises as *the bona fide guest* of Eric Cada. To force Mr. Cada, at gunpoint, to rent the room and then force Mr. Cada to accept his captor into that room with him is self-evidently a disqualification for that *bona fide* status as a guest that would give rise to derivative standing.

■ In the second place, the derivative Fourth Amendment protection that a guest enjoys through his host is never superior to nor independent of the right asserted by the host. If a host, as is his prerogative, chooses to invite the police into the premises, the guest will have no constitutional complaint. In this case, Eric Cada implicitly consented to the police entry into the motel room; that is, he implicitly consented to his rescue. Quite obviously, he did not insist that the rescue attempt abide some Fourth Amendment warrant-issuing ceremony.

The coverage of the Fourth Amendment is an issue that is analyzed objectively by the judge on the basis of all that is known at the time of the suppression hearing or of the trial. The burden of showing Fourth Amendment coverage is, of course, upon the appellant. The appellant had the full opportunity at the suppression hearing to show, if he could, that Eric Cada objected to the warrantless police entry into the motel room in the course of the rescue. The appellant did not do so. The ruling on the appellant's lack of standing to object was preeminently correct.

### b. Fourth Amendment Merits: Exigent Circumstances Exception to Warrant Requirement

With commendable caution, the court did not rest its ruling not to suppress the evidence exclusively on her finding that the appellant was disentitled to litigate the Fourth Amendment merits. Assuming, *arguendo*, such entitlement, the court went on to rule that the appellant failed to justify suppression on the Fourth Amendment merits. More precisely, she ruled that the police satisfied the Fourth Amendment merits by searching and seizing in a reasonable manner.

We fully agree with the alternative rationale that, even if the appellant had standing to object, the warrantless entry into the motel room was fully justified by exigent circumstances. Judge Hollander analyzed those circumstances at great length:

"Again, at the very time entry was made, Spanos suspected, as he put it, foul play. He testified that he was on duty on the night of April 21 and that Officer Stinchcomb had received a phone call reporting two people, Eric Cada and Kim Goldscher, as missing. Goldscher apparently had not shown up at work. Cada apparently had not returned home as expected.

The police did speak to Cada's roommate and the parents of the missing people. It was also determined that Cada's Jeep Cherokee was missing. Investigation was swift on the part of the police. It was learned through the investigation that Cada's credit card number had been used in Virginia

and Maryland within a few hours. No one knew of any reason why these two would have gone to Virginia.

The credit card was used twice at a motel in Maryland. The police were not able to locate the name of the hotel or motel at which it was used because it was Sunday night. It was also learned that Cada, who was a certified public accountant at a large firm with out of state clients or out of town clients, was to have left the very next morning on a business trip and had the kind of personality that he would have made arrangements to be ready for the trip. But no packing had taken place. He had not told his roommate that he was going anywhere that day, and they were described as being close. Goldscher had no known emotional or personal problems to explain her absence.

Spanos drove around Baltimore County and saw nothing which led him to the victims. On route back to Howard County, he decided to continue his search by checking various motels with which he was familiar. Again, his persistence is to be commended. That investigation took him to the Terrace Motel where he observed the Jeep Cherokee matching the description of Mr. Cada's right there in the parking lot.

Spanos described the motel, the Terrace Motel, as sleazy—the kind that is rented by the hour. It is in an area not far from Mr. Cada. So he ruled out in his mind, I believe, that Mr. Cada was renting the motel room for sex because it was right near where he lived. Cada had a nice expensive home and he had had Ms. Goldscher at his town home just the night before. Spanos could not think of a reason why Cada would have needed to rent the motel room in the very vicinity of his own home.

Ms. Shepherd raises the [specter] of 'kinky' sex and drug transactions. But again, in the mind of the police, there was nothing with what they knew of Goldscher and Cada to lead Sergeant Spanos to believe that that is why the Jeep was parked there.

At that particular motel, Sergeant Spanos actually verified the Jeep was Mr. Cada's. He sent Stinchcomb to the

desk clerk and confirmed that a room had been rented in Cada's name. They learned the room number, and Spanos testified that he peered into the room through an opening in the curtains and was able to detect that three people were inside.

When he testified the first time, he said that he saw that one of the people was a black male and one was a white female. Certainly, I cannot disagree with Ms. Shepherd in her contention that there are legitimate possibilities as to why three people would have been in that room, but I believe that the officer also was acting prudently and reasonably, in the interests of the safety of the people in that room, when he concluded that they may have been there against their will or that they may have been in danger.

Spanos believed they were all asleep and that was clearly the time to act. Any delay, he believed, may have jeopardized their lives. Again, this is a conclusion with which I cannot find any fault. I don't discount the fact that there was no blood on the scene. There were no signs of injury or struggle. The room was not ransacked from anything that Spanos could tell, nor did he have any information as to the identity of the perpetrator, or as to whether this person was armed.

While the presence of those signs would make this case more clear cut, I am not prepared to say that the absence of those signs makes the circumstances any less exigent. From all of the things that the officer knew about the people who were missing, from the length of time, eighteen hours, I believe he acted reasonably when he decided that quick and decisive action was needed. For him to have waited to get a warrant or to have called the room to say 'are you all right in there' would have been ill-advised, and may well have resulted in serious injury or escape.

I believe, therefore, for these and other reasons, that there was a legitimate exigency and that the officers acted lawfully in their decision to enter that room without a warrant. I therefore find that the defendant's Fourth Amendment rights were not violated, even if he did have

standing to contest the search. For these reasons, the motion will be denied."

We affirm the ruling that the warrantless entry into the motel room was reasonable under the exigent circumstances exception. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The legitimacy of that warrantless entry, *ipso facto,* legitimates the police seizure of two handguns, one seized from the bed on which the appellant was lying and the other taken from the shoulder holster the appellant was wearing.

### c. A Reinforcing Rationale: Search Incident to Lawful Arrest

The seizure of the two guns, moreover, could alternatively be legitimated under the independent theory of search incident to lawful arrest. Although the legitimacy of the warrantless entry into the motel room is necessary to the legitimacy of the appellant's subsequent warrantless arrest, it is by no means all the police had to justify that arrest. In the split second between the smashing open of the chained door and the arrest of the appellant, one additional, and very significant, fact intervened. As Sergeant Spanos came through the door, his "attention went to the female. She jumped up very quickly and pointed toward the suspect [the appellant], ..., the black male with the blue suit jacket on." As she pointed toward the appellant, she yelled out, "He's the one who kidnapped us." Sergeant Spanos immediately grabbed the silver .38 lying on the bed, then handcuffed the appellant, and then took a 9 mm. semi-automatic from the shoulder holster under his right armpit. The Sergeant then also recovered magazines of cartridges that were in a magazine pouch. If a clincher were necessary for the appellant's warrantless arrest, Kimberly Goldscher's excited accusation clinched it.

### d. Fourth Amendment Merits: Consent Exception to Warrant Requirement

A circumstance already alluded to in discussing the threshold of Fourth Amendment coverage also has significant perti-

nence on the Fourth Amendment merits. Quite aside from the reasonableness of the warrantless entry into the motel room under an exigent circumstances rationale, the entry was also reasonable because it was with the implicit consent of the person to whom the room was registered and with the implicit consent of the second captive in the room, Kimberly Goldscher. Eric Cada's standing in the motel room (and thereby his authority to consent to a police entry) was superior to that of the appellant. Kimberly Goldscher's status was at least as good as that of the appellant, if not, indeed, better because her presence was not illegitimate. Self-evidently, both Cada and Goldscher implicitly consented to their rescue and to the timely entry into the motel room that effectuated that rescue.

In a more precise sense, of course, such implied consent would not even have been necessary. The pivotal criterion is whether the police were reasonable in concluding that Cada and/or Goldscher implicitly consented to their entry. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Florida v. Jimeno,* 500 U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). We do not hesitate to hold that the Howard County officers were reasonable when they concluded that Eric Cada and Kimberly Goldscher desired to be rescued. The physical evidence was properly not suppressed.

### 2.  *The Appellant's Statement:*

#### a.  **Fruit of a Poisonous Fourth Amendment Tree?**

Our holding that the warrantless entry into the motel room was legitimate and our closely related holding that the warrantless arrest of the appellant (and its attendant search incident) was legitimate establishes directly that the two guns were properly not suppressed. Those holdings, moreover, also undercut one of the appellant's theories as to why a subsequent statement by him and evidence with respect to three buried bodies should also have been suppressed. That theory is that the subsequent statement and all derivative evidence that flowed from it was the fruit of the poisonous Fourth Amendment tree—the appellant's ostensibly unlawful arrest. Our holding that the tree was not poisonous, *ipso*

*facto,* leads to the conclusion that its fruit was not poisoned. Under the circumstances, it is not necessary for us to resort to the detoxifying mechanism of *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) and *Torres v. State,* 95 Md.App. 126, 619 A.2d 566 (1993), which detoxifying mechanism would have been fully efficacious in that respect had it been necessary.

### b. Maryland Common Law

We note, in passing, that the appellant also claims on appeal that his statement violated the Maryland common law. The court disposed of that issue summarily and we affirm its disposition in that regard:

"Though not specifically addressed in argument, I further find that Burks' statement satisfied the State's nonconstitutional requirements as to voluntariness."

### c. *Miranda* and *Edwards*:

We now direct our focus to a subsequent incriminating statement made by the appellant. Having disposed of any challenge to the statement as an unattenuated exploitation of a Fourth Amendment violation, we will confine the context for our analysis to the Fifth Amendment privilege against compelled self-incrimination as implemented by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and further implemented by *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Following two weeks of testimony on the closely related suppression issues, the judge rendered a meticulously thorough and legally flawless 43–page opinion from the bench in which she was "persuaded, by a preponderance of the evidence, that the State [had] met its burden. The defendant's statement was voluntary and his *Miranda* rights were not violated."

Although it was the Howard County police who arrested the appellant at approximately 1:30 A.M. on Monday, April 22, 1991, the arrest was for a kidnapping that had occurred in Baltimore County. Accordingly, the Howard

County police turned the appellant over to the Baltimore County police almost immediately. Early that morning, Officer John McNaney ran a computerized check on the appellant and found that Baltimore City had an outstanding warrant for the appellant's arrest. The Baltimore City police were contacted by 9:30 A.M. Detective Mark Tomlin and Sergeant John Barrick of the Baltimore City Police Department arrived in Baltimore County by 11 A.M. and took custody of the appellant. The incriminating statement in issue was made to Detective Tomlin and Sergeant Barrick.

In a Tinker-to-Evers-to-Chance transfer such as this, the validity of the ultimate statement depends upon each of the three jurisdictions' executing its role flawlessly. We turn first to Howard County.

Initially, the appellant was held in Room 23 of the Terrace Motel for approximately forty minutes and then transported to a Howard County police station for booking purposes. The appellant was never questioned by Howard County police about the offense. Notwithstanding the absence of questioning, the appellant was fully apprised of his *Miranda* rights by Officer Yvonne Stinchcomb in the presence of Sergeant Spanos and Officer Robert Castor. According to all three Howard County officers, Officer Stinchcomb read the appellant his rights from a standard *Miranda* card issued to all Howard County officers. All three testified that the appellant acknowledged that he understood his rights, when specifically asked to respond in that regard by Sergeant Spanos. The appellant agrees that he was fully apprised of his rights and that he was not questioned by the Howard County officers.

The appellant claims, however, that he asked for the presence of an attorney. The Howard County officers, on the other hand, testified that no request for an attorney was made. As was her fact-finding prerogative, the judge credited the testimony of the Howard County officers. No constitutional or legal error had been committed by Howard County as, during the early morning hours, it passed the appellant on to Baltimore County.

Officer Gamble of the Baltimore County Police Department picked up the appellant and transported him to the Wilkens Avenue Precinct Station. He was then booked and processed by Officer John McNaney. At no point, while in the custody of the Baltimore County officers was the appellant readvised of his *Miranda* rights. At no point while in the custody of the Baltimore County officers was the appellant interrogated about anything. As the court found, "They did not intend to interview him." It observed that they had no need to interview him because "they had him dead to rights." Corporal Steven Fink testified that as far as the kidnapping in Baltimore County was concerned, "They had what they needed and they were not planning to talk to him."

The appellant nonetheless claims that he told Officer McNaney that he wanted an attorney. Officer McNaney testified that he never made any such request. Again, as was her prerogative, the judge credited the Baltimore County officers. No constitutional or legal error had been committed by Baltimore County as, during the late morning, it passed the appellant on to Baltimore City.

Both Detective Tomlin and Sergeant Barrick testified that they fully informed the appellant of his *Miranda* rights. The appellant does not dispute this. Indeed, he placed his initials next to each right after reading it aloud to the detectives. The officers testified that the appellant agreed to be interviewed and agreed to waive all rights. They testified further that the appellant never invoked either his right to remain silent or his right to the presence of an attorney. The appellant testified that he did request an attorney.

The judge explained at some length why she disbelieved the appellant and believed the officers. She explained that the appellant had made such a claim with respect to all three jurisdictions and that she did not believe that there was a widespread police conspiracy for some seven or eight officers from three jurisdictions to lie in this regard, particularly the Howard County officers, who had nothing at stake. A finding of credibility is the type of finding where the appellate court, of necessity, extends maximum deference to the fact-finding

judge who listens to and observes the witnesses. Accepting the trial court's findings as to credibility, we inevitably conclude as she did that *Miranda* was not violated.

### d. General Due Process Voluntariness:

Because the appellant allusively claimed a due process violation in addition to a *Miranda* violation, the judge took pains to detail her ruling in that regard. She pointed out that the appellant, when he was interviewed by the Baltimore City detectives, "did not appear ill or in any discomfort." She credited their testimony that he was "alert, coherent, and oriented." They had testified, as well, that he "did not appear to be under the influence of drugs or alcohol." His "speech was not slurred and they were very impressed with his intelligence." The judge pointed out that the appellant was thirty-one years of age and had completed two years of college. She also found him "to be intelligent and articulate." As to voluntariness generally, she explicitly found that the appellant "knew what he was doing and did what he chose to do." Our conclusion is the same.

We hold that the court properly ruled that the statement given by the appellant to the Baltimore City detectives would not be suppressed. It follows from that holding that we also affirm the decision not to suppress the fact that the appellant led the Baltimore City detectives to an isolated spot in Anne Arundel County where the appellant and Marvin Willis had dumped their three homicide victims. Evidence with respect to the three bodies was also properly not suppressed.

### *Jury Argument: A Robust Forum*

██ The appellant's sixth contention is that the judge erroneously permitted the State to present an improper rebuttal argument. In the course of rebuttal, the following exchange took place:

"What I want to know is, how do you know that the defendant is not capable of violence? Whose word do you have for that? The defense counsel's word for it ultimately because nobody came here to tell you he is not capable of

violence. It is the defendant only who testified, and now I want to remind you, how do you know that Marvin Willis had been a violent person before this week? Because a defendant who claims self-defense is entitled to bring witnesses in here—

Mrs. Shepherd: Objection.

Mr. Schultz: —to tell you as to—

The Court: Wait a minute, you want to approach?

Mrs. Shepherd: The same grounds as earlier.

The Court: Overruled."

We find that no abuse of discretion in the ruling that the argument was proper. The issue was the appellant's claim of self-defense. In an effort to establish that defense, the appellant attempted to show that one of the murder victims, Marvin Willis, was a violent person of whom the appellant was very much afraid. In defense counsel's closing argument, Willis was characterized as "a loose cannon capable of extreme violence." Counsel argued that the appellant had witnessed Willis gun down three people and had witnessed his repeated stabbing of one of the victims. Defense counsel emphasized that the appellant had heard Willis label his own cousin and the cousin's girlfriend as "loose ends" and that Willis had plotted their murders. Defense counsel invited the jury to empathize with the appellant's "terror" when Willis began calling him a "loose end." Defense counsel argued that the appellant's complicity with Willis following the basement murders and the appellant's ultimate shooting of Willis had been borne of justifiable fear.

We read, as did the trial court, the rebuttal argument now in issue as a legitimate comment upon the appellant's dearth of testimony to support the high-flown rhetoric of defense counsel. We do not remotely read the rebuttal argument as one shifting the burden of persuasion to the defense. The appellant asserted self-defense. His lawyer argued self-defense. In countering that argument, the prosecutor legitimately pointed out that the defense consisted far more of defense counsel's speculative rhetoric than it did of hard

evidence. That, in the last analysis, is the purpose of jury argument. We see nothing improper.

### Nonpreservation of Objection

■ The appellant's seventh contention is that the court erroneously permitted Sergeant Spanos to introduce irrelevant and prejudicial hearsay against the appellant. Sergeant Spanos was relating how he broke into the motel room in which the appellant was holding his kidnapping victims, Eric Cada and Kimberly Goldscher, as hostages. Sergeant Spanos testified that as he was entering the room, Kimberly Goldscher "pointed at [the appellant] ... [and] said he kidnapped us." The short answer to the contention is that no objection was raised to this testimony and nothing, therefore, has been preserved for appellate review. Md. Rule 4–323; *Oaks v. State,* 83 Md.App. 1, 11, 573 A.2d 392 (1990).

### The Sentencing

The appellant's final contention is that the docket entries do not accurately reflect the actual sentences imposed on the appellant. For closely related crimes (the kidnappings of Cada and Goldscher), the appellant had already been sentenced to forty years in Baltimore County. In the present case, the judge sentenced the appellant to thirty years for one of the murders, that sentence to be served consecutively with the forty-year sentence in Baltimore County. In the second murder conviction in this case, she sentenced the appellant to another thirty years, to be served consecutively with both the Baltimore County sentence and the thirty-year sentence in this case for the first murder. The twenty-year sentence for the use of a handgun in the commission of a crime of violence was, indeed, made concurrent with the two thirty-year murder sentences. The appellant now complains that the docket entries reflecting two thirty-year murder sentences to be served consecutively with each other and also consecutively to the Baltimore County sentence are incorrect and that the actual sentencing imposed, as reflected by the transcript, was that the two murder sentences were to be served concurrently

with each other. The issue is whether in this case the appellant received sixty years of additional time or only thirty years of additional time.

The appellant's contention disappears with the disappearance of its factual predicate. As we read it, the sentencing, as shown in the transcript, is completely compatible with the docket entries:

"To make it very simple. Consecutive to Baltimore County the sentence in the case of the murder of Mr. Newman, I sentence you to the Division of Correction for a period of thirty years, which is the maximum for second degree murder. *Consecutive to that sentence and consecutive to the Baltimore County sentence, I further sentence you to an additional thirty years. So far that means sixty years consecutive.*" (emphasis supplied).

We see no error.

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY APPELLANT.