471 A.2d 320

**Joseph Francis CIRIAGO aka Joseph Francis Cireago aka Rickie Norman McNair**

v.

**STATE of Maryland.**

No. 579, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Feb. 9, 1984.

Certiorari Denied June 25, 1984.

Jeffrey Lee Greenspan, Washington, D.C., with whom were Gary Steven Mandel and Greenspan & Mandel, P.C., Washington, D.C. on brief, for appellants.

Bernard A. Penner, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen. of Maryland, Sandra A. O'Connor, State's Atty., for Baltimore County and Anthony Gallagher, Asst. State's Atty., for Baltimore County on brief, for appellee.

Argued before MOYLAN, WILNER and WEANT, JJ.

MOYLAN, Judge.

This constitutionally uncomplicated but factually interesting case presents us with truly textbook examples of two investigative phenomena which are today very topical in the world of criminal procedure. We are given the very model of the *bona fide* inventory of personal property. We are given the very model of the spontaneous blurt. We caution at the outset that our description of each model does not remotely suggest a minimum standard or *sine qua non*. In the world of inventory searches, there will be many that are *bona fide* and constitutional but few that will even approach the perfection herein described. In the world of spontaneous blurts, there will be many that are constitutionally sound but few that will even approach the perfection herein described. Nonetheless, it will facilitate later analyses to have a picture of the models.

The appellant, Joseph Francis Ciriago, was a major courier in the East Coast narcotic traffic but one on whom no local suspicion had focused prior to Wednesday, September 8, 1982 at approximately 6:30 p.m. At that time, the appellant literally drove an automobile off a Baltimore County byway and figuratively crashed his way into the Maryland Penitentiary for the next eleven years. On an agreed statement of facts, he was convicted by Judge J. William Hinkel, sitting without a jury, in the Circuit Court for Baltimore County, of 1) the unlawful possession of contraband cocaine with intent to distribute and 2) the unlawful possession of a handgun. Upon this appeal, he raises three contentions:

1.  That the evidence found in his automobile should have been suppressed under the Fourth Amendment;

2.  That a comment he made, from his hospital bed, to two Baltimore County policemen should have been suppressed under the Fifth Amendment; and

3.  That another comment he made while standing with a group of fellow prisoners, while waiting to enter the Baltimore County Jail, should have been suppressed under the Fifth Amendment.

### The Good Faith of the Inventory

■ It is now hornbook law that as part of their community caretaking function, the police are frequently well-advised to inventory the personal property found in a seized or impounded automobile, *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and also the personal property found in luggage or other containers that come within their lawful custody, *Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Whenever such an inventory yields evidence of crime, the key issue becomes that of whether the police initially undertook the inventorying in good faith or used it as a mere subterfuge in a deliberate effort to obtain evidence of crime. This Court has historically been as skeptical as any in the land as to the abuse of the inventory rationale, *Dixon v. State,* 23 Md.App. 19, 327 A.2d 516 (1974); *Waine v. State,* 37 Md.App. 222, 377 A.2d 509 (1977); *Manalansan v. State,* 45 Md.App. 667, 415 A.2d 308 (1980), but has recognized that when honestly employed, it is constitutionally unassailable.

The Supreme Court has been far more latitudinarian than we, *South Dakota v. Opperman, supra, Illinois v. Lafayette, supra,* and *Illinois v. Bean,* —— U.S. ——, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983), but has recognized that the use of the inventory as a subterfuge will not be countenanced.

The Court of Appeals has placed its express imprimatur upon the inventorying of the contents of an automobile being impounded or towed from an accident scene. In *Duncan and Smith v. State,* 281 Md. 247, 256–257, 378 A.2d 1108 (1977), Judge Orth, for the Court, discussed the legitimacy of and the reasons for this particular police procedure:

"Activities concerning automobiles carried out by local police officers in the interests of public safety and as 'community caretaking functions' frequently result in the automobile being taken in custody. 'Vehicle accidents present one such occasion to permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be re-

moved from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. . . . It is the legal impoundment of an automobile which permits the inventory search of the vehicle. 'When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents.' *Id.* [428 U.S.] at 369 [96 S.Ct. at 3096]. These procedures developed in response to three distinct needs: (i) protection of the police from danger; (ii) protection of the police against claims and disputes over lost or stolen property; and (iii) protection of the owner's property while it remains in police custody."

In the service of precisely the same social interests, the Supreme Court did not hesitate to extend the inventory search rationale to the contents of purses, shoulder bags, suitcases and other containers also legitimately in police custody. In *Illinois v. Lafayette, supra,* it reasoned, at 103 S.Ct. 2610, at 77 L.Ed.2d 71–72:

> "[T]he search was reasonable because it served legitimate governmental interests that outweighed the individual's privacy interests in the contents of his car. Those measures protected the owner's property while it was in the custody of the police and protected police against possible false claims of theft. We found no need to consider the existence of less intrusive means of protecting the police and the property in their custody—such as locking the car and impounding it in safe storage under guard. Similarly, standardized inventory procedures are appropriate to serve legitimate governmental interests at stake here."

In the course of the *Illinois v. Lafayette* analysis, the Supreme Court disdained any notion that the police are constitutionally required to seek out the least intrusive means of accomplishing these social purposes. The Illinois Appellate Court had deemed the inventorying of the contents of a shoulder bag unconstitutional because of its opinion that the community caretaking function "could have been achieved in a less intrusive manner." 99 Ill.App.3d 830, 835, 55 Ill.Dec. 210, 213, 425 N.E.2d 1383, 1386 (3d Dist.1981). In reversing

the Illinois Appellate Court, the United States Supreme Court responded:

"Perhaps so, but the real question is not what 'could have been achieved,' but whether the Fourth Amendment *requires* such steps; it is not our function to write a manual on administering routine, neutral procedures of the stationhouse. Our role is to assure against violations of the Constitution.

The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." 103 S.Ct. at 2610, 77 L.Ed.2d at 72. (Emphasis in original).

In dealing with a similar contention in *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2530, 37 L.Ed.2d 706 (1973), the Supreme Court had concluded, "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." In *Illinois v. Lafayette, supra,* the Supreme Court concluded, at 103 S.Ct. 2610, at 77 L.Ed.2d 72:

"Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit."

With these guidelines in mind, we turn our attention to the case at hand.

A suppression hearing judge will naturally be interested, when the police respond to the scene of an accident or a traffic offense, in whether the police had any preexisting knowledge that the motorist was involved in criminal behavior. In the instant case, the police not only did not suspect a crime but had never even heard of the appellant before they found him in the middle of the southbound lane of Park Heights Avenue Extended, severely injured, pinned in the wreckage of a Florida-registered 1979 Datsun.

A suppression hearing judge will naturally be interested in whether the officer at such a scene is a traffic officer carrying out his customary mission, or a narcotics officer strangely involved in a traffic case for the first time in his professional career. The key officer in this case was T.K. Williams of the Baltimore County Police Traffic Division.

The suppression hearing judge will naturally be interested in whether entry into the automobile seems reasonably necessary. In this case, Salena Silver and Edward Stephens were operating their respective vehicles in the area of Park Heights Avenue Extended and Caves Road when they noticed the appellant's Datsun cross the center line of the roadway as it was traveling northbound. The Datsun went all the way across the southbound lane and off the road entirely. It struck a tree, spun in a counter-clockwise direction down the shoulder of the road and struck a second tree. The Datsun came to rest facing west and squarely athwart the southbound lane of the road. The vehicle was massively damaged and the appellant was severely injured. In response to a call from the two civilians, rescue personnel were soon upon the scene.

In order to render emergency first aid, the rescuers had to enter the vehicle through the rear hatchback section, since both front doors were jammed closed. It was necessary to remove suitcases and other items from the rear of the automobile in order to reach the appellant, who was pinned inside. Because of the apparent severity of the appellant's injuries, the Maryland State Police MEDIVAC helicopter was summoned to the scene.

When Officer Williams arrived at 6:50 p.m., the appellant was still pinned beneath the steering wheel with an oxygen mask across his face and bandages on his head. The hatchback door was open and the two front doors had been pried open by emergency personnel. The paramedics were attempting to extricate the appellant's body from the automobile. Judge Buchanan concluded that the entry into the automobile was not unreasonable.

Immediately following the evacuation of the appellant by helicopter, Officer Williams began to inventory the personal property both within the Datsun and strewn about and upon the highway and its shoulders. With respect to the automobile itself, a suppression hearing judge will naturally be interested in whether police impoundment was necessary or whether there were other friends or relatives capable of driving the automobile from the scene. In this case, the appellant, a resident of Florida, was alone. The automobile, moreover, was registered not to him but to one Jacqueline Holder of Oak Park, Florida. The name on the appellant's driver's license was not his real name. Quite aside from the total absence of friends or relatives, the automobile was completely inoperable.

The automobile was sitting in the middle of the roadway and was blocking traffic. Officer Williams summoned Carty's Garage to remove the vehicle from the roadway and to take it to an authorized impounding lot. The inventorying that followed was by the book, following written standardized rules and regulations promulgated by the Baltimore County Police Department.

A suppression hearing judge will naturally be interested in whether the motorist himself has had an opportunity to receive a mere citation and to drive his own automobile away or the opportunity to take personal property with him. In this case, the appellant was lapsing into and out of consciousness as the evacuation helicopter rushed him, with minutes counting, to the Shock Trauma Unit of the University Hospital.

A suppression hearing judge will naturally be interested in whether a roadside confrontation was *bona fide* or a mere subterfuge. The accident in this case was very real. The appellant, moreover, was ultimately charged in Baltimore County with failing to keep to the right of the center line, with negligent driving, and with driving with a suspended Florida license.

Even following the chance discovery, in the course of the inventory, of items that took on a massive significance of their own, the inventory list itself was dutifully completed by 10 p.m. that evening and a copy ultimately delivered to the appellant.

In explaining the social utility of the inventory search, one of the concerns discussed by the Supreme Court in *Cady v. Dombrowski, supra,* was the necessity to take out of possible circulation and to shield from possible public access, dangerous instrumentalities. One of the containers, the contents of which were routinely inventoried by Officer Williams in this case, was a gray briefcase. In that briefcase, closed but unlocked, Officer Williams discovered two automatic handguns. One was a Llama .45 caliber automatic with one live round. The other was a Pietro Beretta .38 caliber automatic with one live round in the chamber and seven live rounds in the clip.

Again by way of explaining the social utility of the inventory search, another of the concerns, discussed by the Supreme Court in *South Dakota v. Opperman, supra,* is the desirability of guarding from possible theft items of value which are particularly vulnerable to theft. Another of the containers, the contents of which were routinely inventoried by Officer Williams in this case, was a silver metal briefcase. In that briefcase, closed but unlocked, Officer Williams discovered $19,000 in cash. He also discovered two clear plastic bags containing white powder and a brown taped container with white powder leaking from it. Subsequent analysis revealed the powder to be 3.8 pounds of cocaine hydrochloride.

■ At the conclusion of the suppression hearing, Judge Buchanan found as a matter of fact that the inventory had been executed in good faith.[1] He declined to suppress the

---

1. We note that the inventorying of the silver metal briefcase and the discovery of the cash and the cocaine preceded the inventorying of the gray briefcase, which led to the discovery of the two handguns. Although the appellant raises no question as to the possible impact

two guns, the ammunition, the $19,000 in cash, and the 3.8 pounds of cocaine. In making our own independent, reflective judgment on this mixed question of law and fact; this conclusory or constitutional fact; this ultimate, second-level fact—the existence of good faith in the execution of the inventory, *Walker v. State,* 12 Md.App. 684, 691, 696, 280 A.2d 260 (1971), we find, even as did Judge Buchanan, that the inventory was executed in good faith. We, therefore, affirm the admissibility ruling of Judge Buchanan.

### The First Blurt

After discovering the probable narcotics, not to mention the guns and the cash, Officer Williams contacted detectives from the narcotics squad. Subsequently, Officer Williams in uniform, accompanied by Detective Robert E. Fink in civilian clothing, went to the hospital for the declared purpose of interviewing the appellant as to how the accident occurred. At the very outset of the conversation, the appellant made a significantly incriminating admission. At the pretrial suppression hearing, Judge Buchanan ruled that it was voluntary and that because it was not made in response to interrogation, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was inapplicable. The logistical problem was that the admission was out of the appellant's mouth before the officers even had the opportunity to commence the *Miranda* ritual.

As we discuss whether we find the same constitutional fact that Judge Buchanan did, to wit, that this admission was, indeed, a "blurt," it will help to put the whole subject in some perspective. The appellant argues strenuously that the admission was not a blurt but was in response

---

of the first discovery on the subsequent course of the inventorying process, it may well be that an additional justification invigorated that portion of the search that followed the discovery: probable cause to believe that additional evidence of crime would be discovered in the automobile and/or in the various containers that were still or had been within that automobile. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

to interrogation, or at least to the functional equivalent of interrogation. There is, of course, no ultimate significance to the fact of interrogation as such. The issues of custody and interrogation take on significance because of the pivotal jurisdictional holding in *Miranda* that "custodial interrogation is inherently coercive." That "bright line" ruling is indispensable to constitutional consideration, because without the establishment of compulsion (now by virtue of the "bright line" short cut), the gears of the Fifth Amendment privilege are not engaged. There is no privilege against inadvertent self-incrimination or even stupid self-incrimination, but only against compelled self-incrimination. If there is custody and if a statement is in response to interrogation, there is thereby established the element of compulsion which is the jurisdictional predicate for further constitutional analysis.

■ We turn to the case at hand. As Officer Williams and Detective Fink walked into the appellant's hospital room, Officer Williams began to explain his purpose in being there. The appellant, drawing immediate significance from the fact that Detective Fink was not in uniform, interrupted with the observation directed at Fink, "You're not a traffic cop, so I guess I'm under arrest." To that, Detective Fink simply responded that the appellant was not under arrest. The appellant shot back, "Don't bullshit a bullshitter, because if I was a cop and you had that much 'shit' in your car, you would be under arrest." [2] That is the admission in issue. *Mirabile dictu.*

Is that a blurt? Is that a blurt! It is the quintessential blurt. It is the very Taj Mahal of blurts. In the pantheon of blurts, the place of honor has been reserved for it. If we were to teach the subject of blurts (as indeed we now do), it would be the crowning example (as indeed it now is).

---

**2.** In the narcotics subculture, the word "shit" is a term of art referring to hard-core narcotics, generally heroin or cocaine.

Once again, exercising our own independent, reflective judgment as to this conclusory or constitutional fact, *Walker v. State, supra,* we could not agree more wholeheartedly with Judge Buchanan that this was, indeed, a blurt. We, therefore, affirm his ruling in this regard.

### The Second Blurt

It should be clear to even the amateur psychologist that at a subconscious level, the appellant here, through his driving and through his blurting, was bent on self-destruction. In terms of unsolicited spontaneity, the second blurt was almost as classic as the first. Far from compelling the appellant to talk, the police couldn't shut him up.

On September 10, Detectives Fink and Rill were taking a number of prisoners, coincidentally including the appellant, to the Baltimore County Jail. As they were all milling about the entrance area to the jail, Detective Rill idly read aloud the bail figure on another prisoner whose commitment papers were visible on a desk top. The casual comment had absolutely nothing to do with the appellant. The appellant, however, coveting stage center, brought up before the entire assembly the subject of his own bail, which was none. He volunteered that even if his bail were lowered to $100,000, he could not make it, because he, after all, was only a "carrier." [3] That is the second admission in issue.

The only compulsion operating on the appellant was an apparent and inner Joycean compulsion to vocalize his very stream of consciousness. From a tactical point of view, his garrulousness was very foolish, but it is not the mission of the Bill of Rights to protect a fool from his folly. Effective criminal detection depends in large part upon the carelessness and even stupidity of the average criminal. The Constitution does not require continuing legal education seminars for the criminal class in "How More Effectively to

---

**3.** He probably said "courier." It is a distinction without a difference.

Cover One's Tracks." Far from wishing to eliminate them, society needs and depends upon the blunders.

In affirming the ruling, in this instance of Judge Hinkel, that the second blurt was admissible, we agree with former Chief Judge Joseph Weintraub of New Jersey, as he observed in *State v. McKnight,* 52 N.J. 35, 243 A.2d 240, 250–51 (1968):

> "There is no right to escape detection. There is no right to commit a perfect crime or to an equal opportunity to that end. The Constitution is not at all offended when a guilty man stubs his toe. On the contrary, it is decent to hope that he will. Nor is it dirty business to use evidence a defendant himself may furnish in the detectional stage. Voluntary confessions accord with high moral values, and as to the culprit who reveals his guilt unwittingly with no intent to shed his inner burden, it is no more unfair to use the evidence he thereby reveals than it is to turn against him clues at the scene of the crime which a brighter, better informed, or more gifted criminal would not have left. . . . It is consonant with good morals, and the Constitution, to exploit a criminal's ignorance or stupidity in the detectional process."

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.