721 A.2d 275

**STATE of Maryland**

v.

**Carol Lynn ALEXANDER and James Carlon Alexander.**

**No. 607, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 7, 1998.

260

Thomas K. Clancy, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General, on the brief), Baltimore, for appellant.

Robert H. Harvey, Jr., Prince Frederick, for appellee, Carol Alexander.

Michael K. Manning, Prince Frederick, for appellee, James Carlon Alexander.

Submitted before MURPHY, C.J., and MOYLAN and WENNER, JJ.

MOYLAN, Judge.

The appellees, James Carlon Alexander and Carol Lynn Alexander, husband and wife, were charged by a Calvert County grand jury with 1) the possession of marijuana with intent to distribute and 2) simple possession. At a pretrial hearing, the circuit court granted the appellees' motion to suppress all physical evidence on the ground that a search warrant was tainted by an antecedent entry into appellees' home that had violated the Fourth Amendment. The State appealed that suppression ruling pursuant to Md.Code (1995), Cts. & Jud. Proc. § 12–302. On October 14, 1998, this Court reversed that ruling and remanded the case for further proceedings. We there announced that this opinion would follow.

Our decision that the physical evidence should not have been suppressed was easy to reach. Formulating and articulating the basis for that decision has been more difficult. Whichever of two Fourth Amendment standards might be deemed to apply—1) probable cause to believe that a burglary had been or was then being committed in the appellees' home or 2) the general reasonableness of the police response—the Fourth Amendment was not offended and the evidence should not have been suppressed. Because of the non-typical relationship between the appellees and the police in this case, however, it seems advisable to determine the proper framework of analysis for the police behavior and to decide which of those standards needs to be satisfied in circumstances such as these.

When the police initially entered the home of the appellees, the appellees were not the target of any police investigation nor were they believed to be harboring fugitives or concealing

evidence of crime. There was, moreover, no remote hint of subterfuge; no narcotics officers were waiting, opportunistically, for an excuse to reconnoiter an otherwise protected asylum.

It is undisputed that the police were not pursuing the appellees but were attempting to come to their possible aid. Fourth Amendment justification for seizing the persons of the appellees or for searching their home for evidence of crime, therefore, was not in any way an issue. Probable cause to invade the Fourth Amendment rights of a suspect, as the basis for either a search warrant or for appropriate warrantless activity, was not in any way an issue. The appellees were not suspects but citizens in possible distress. From the police perspective at all times prior to the ultimate discovery of drugs in the appellees' home, the appellees were innocent homeowners who were the possible victims of a crime and who were deserving of prompt police intervention and protection. The question before us is the appropriate standard by which to assess the Fourth Amendment reasonableness of such intervention and protection. What is a reasonable basis for coming to the aid of a person who apparently needs help?

## The Factual Background

The underlying facts are not in dispute. On November 27, 1997, Thanksgiving Day, the Calvert County Sheriff's Department Control Center received a call at approximately 1:00 p.m. The caller, who wished to remain anonymous, nonetheless gave his address as 11626 Deadwood Drive. He informed the control center that his next-door neighbor's basement door was open and that he believed that the neighbor was away. The caller then gave the address of the neighbor's house as 11541 Deadwood Drive. On receiving this information, the control center notified Corporal Brian Koehn, who was on routine patrol, and ordered him to respond to the residence because of a "possible breaking and entering." Corporal Koehn was given the address of the residence along with a description of the house.

When Corporal Koehn arrived at the house, he noticed a neighbor across the street looking at him. He did not approach the neighbor because he did not want to leave the residence unsecured or to give anyone inside the opportunity to leave. He further explained that he did not attempt to speak with the neighbor because he had been informed by the control center that the caller wished to remain anonymous. Corporal Koehn did not know that the neighbor who watched him was necessarily the same person who had earlier phoned the control center.

Corporal Koehn walked around the house and checked all doors and windows. He noticed that the basement door was "wide open," but observed no signs of a forcible entry. At that point, he advised Deputy Sheriff Ronald Naughton via radio that the residence had an open door and that he was going to await Deputy Naughton's arrival before attempting to enter the residence. At the suppression hearing, he explained that he decided to wait for Naughton because he believed a breaking and entering was in progress and, for his own safety, he did not want to confront any potential burglars alone. When asked at the suppression hearing why he thought that a breaking and entering was in progress, he recited the following reasons: 1) he had been alerted to a possible breaking and entering by the original radio broadcast; 2) he had observed an open basement door; 3) he had been told the homeowners were away; 4) he observed no vehicles in the driveway; and 5) the house was in a residential area that had been the scene of a rash of recent breakings and enterings.

Deputy Naughton testified at the suppression hearing and confirmed Corporal Koehn's statement that that particular neighborhood had been the scene of many recent breakings and enterings. He further testified that the call he received in the instant case was similar to calls he had received in cases of other recent breakings and enterings and that it was unusual to see any signs of forcible entry into a residence other than an open door.

While still waiting for his back-up, Corporal Koehn "hollered in the house if anybody is home, Sheriff's Office." He received no reply. He then walked around to the front of the house, knocked on the door and rang the doorbell. He heard a dog barking inside but otherwise received no reply.

Shortly thereafter, Deputy Naughton arrived at the scene and also observed the open basement door. The two officers then entered the house through that door and began a sweep of the residence to determine if anyone was inside. They first noticed that the basement was in disarray. While still searching for possible intruders, they opened the door of a walk-in closet in the master bedroom. They there observed marijuana on a shelf in plain view.

The officers left the narcotics untouched on the shelf while they completed their search for intruders. They then secured the house and obtained a search warrant based on their observation of the marijuana. They subsequently executed the warrant and seized the marijuana, along with assorted drug paraphernalia and cash.

## The Proceedings Below

The residents of 11541 Deadwood Drive were the appellees. They were jointly indicted for possession of marijuana and for possession with intent to distribute. On April 16, 1998, a motion to suppress all physical evidence was heard before the circuit court. At the conclusion of the hearing, the judge explained his rationale for suppressing the evidence:

In thinking about this case and in thinking about the search warrant that was presented, I certainly sympathize with the police officers' perspective, but I also sympathize with the private homeowner that if anybody calls and says there is a door open that might have been breaking and entering that the police are going to walk in that house without making some inquiry.

Hindsight is always 20/20. I think in this case it would have been appropriate for the police officers once the back-up unit had gotten there to make an inquiry, minimum

inquiry, minimal inquiry to check with a neighbor to find out, number one, are the people away, how long have they been gone, how long has that door been open, have they seen anybody around, what was the reason somebody thought there was a possible B & E, what . . . the neighbor said or what the police dispatcher said.

So in this case I find there was not a basis for the . . . policemen to go into the house without more . . . .

## A Shifting Standard of Review

■ The first-level facts are undisputed and there is, therefore, no fact finding by the trial judge to which to give deference. At issue is simply the constitutional significance of those facts. With respect to such a conclusory fact or mixed question of law and fact, the appellate court makes its own independent appraisal. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990).

■ To make that independent constitutional appraisal, however, we need first to identify the appropriate standard by which to measure the police behavior in question. The touchstone of Fourth Amendment compliance, of course, is reasonableness. Reasonableness, however, differs with its context. The reasonableness of police behavior is necessarily a function of what the police are doing and why they are doing it.

As the Supreme Court observed in *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720, 731 (1985):

Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, *what is reasonable depends on the context within which a search takes place.*

(Emphasis supplied).

The flaw in the appellees' argument is that it fails to recognize that contexts may shift or, indeed, even to recognize that there may be more than one possible context. It looks,

uncritically, on the initial police entry into 11541 Deadwood Drive as a criminal investigation aimed at discovering evidence against the appellees. It employs, therefore, the familiar tools of analysis—probable cause and exigency—that are traditionally and reflexively used to regulate the adversarial confrontation between the citizen and the criminal investigator.

What the appellees conveniently ignore is that the detection of crime is but a part of the larger police mission and that the zeal that may be excessive in building a criminal case against a suspect may be highly commendable in rescuing a child from a *possibly* burning building or rushing immediate relief to the *possibly* unconscious victim of a heart attack. In the former situation, we admonish the police to hesitate before acting; in the latter situations, such hesitation might be a tragic dereliction of duty. The standard of reasonableness obviously shifts as the reason for the intrusion varies and anti-police wariness is not always the appropriate prism through which to view an officer's conduct.

### The Community Caretaking Function Generally

3 Wayne R. LaFave, *A Treatise on the Fourth Amendment,* § 6.6, p. 389–90 (3d ed.1996), noted the distinction between entering a premises for investigative purposes and entering the same premises for other purposes:

> Preceding sections of this Chapter have been concerned with *the entry of private premises by police for the purpose of* arresting a person thought to be within or for the purpose of *finding the fruits, instrumentalities or evidence of some past crime. Although it is entries for those purposes which most often give rise to a motion to suppress,* requiring a ruling upon the validity of the entry and subsequent conduct of the police, *quite clearly police have occasion to enter premises without a warrant for a variety of other purposes.*

(Emphasis supplied). Professor LaFave also noted the diversity of those other non-investigative purposes:

*The police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;* by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis. *An entry and search of premises purportedly undertaken for such reasons as these may sometimes result in the discovery of evidence of crime.*

*Id.* at 390 (emphasis supplied; footnotes omitted).

What has been lacking for those other, non-investigative police functions is a convenient shorthand label. In the context of the police responsibility to handle vehicular accidents, *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714–15 (1973), chose, as a ready reference, the term "community caretaking function.":

Local police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described *as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

(Emphasis supplied).[1]

In *Stanberry v. State,* 343 Md. 720, 684 A.2d 823 (1996), the Court of Appeals placed its seal of approval on the label

---

**1.** A familiar example of the community caretaking function is the inventory search aimed at securing the personal property in an impounded automobile. *See Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

The inventory search as a community caretaking function has also been applied to opening and listing the contents of a shoulder bag that was in the protective possession of the police. *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). *See also Florida v.*

"community caretaking function" as it recognized the pivotal distinction between assessing police behavior when they are "acting in their criminal investigatory capacity" and assessing police behavior when they are "acting to protect public safety. pursuant to their community caretaking function." 343 Md. at 742–43, 684 A.2d 823. Judge Raker there wrote for the Court:

> [A]lthough we find today that, under the circumstances presented in the instant case, the police search of Petitioner's luggage was unlawful, *we stress that our holding is limited to the conduct of the police when they are acting in their criminal investigatory capacity.* As the Iowa Supreme Court stated in discussing the rationale for the emergency-aid exception to the warrant requirement:
>
>> *In essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress (caretaking function).* Courts have noted that preservation of human life is paramount to the right of privacy protected by the fourth amendment. Thus the emergency-aid exception is justified because the motivation for the intrusion is to preserve life rather than to search for evidence to be used in a criminal investigation.
>
> *State v. Carlson,* 548 N.W.2d 138, 141 (Iowa 1996) (citations omitted). *Our holding does not apply to situations in*

---

*Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). The community caretaking function has also been held to include opening the doors of an impounded vehicle to roll up the windows against the rain. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

In *Ciriago v. State,* 57 Md.App. 563, 567, 471 A.2d 320, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984), this Court well summarized this instance of the community caretaking function:

> It is now hornbook law that *as part of their community caretaking function, the police are frequently well-advised to inventory* the *personal property* found in a seized or impounded automobile and also the personal property found in luggage or other containers that come within their lawful custody.

(Emphasis supplied). *See also Duncan and Smith v. State,* 281 Md. 247, 256–57, 378 A.2d 1108 (1977); *Manalansan v. State,* 45 Md.App. 667, 415 A.2d 308 (1980); *Cleckley v. State,* 42 Md.App. 80, 399 A.2d 903 (1979).

*which the police are acting to protect public safety pursuant
to their community caretaking function.*

*Id.* (emphasis supplied).

### Aiding Persons in Need of Assistance

Whether labeled a "community caretaking function" or not,
one such duty is to aid persons in apparent need of assistance.
If when glancing through the window of a home from the
public sidewalk, for instance, the police see an elderly man
clutch his chest and fall to the floor or even if they only see a
prostrate figure already on the floor, their duty is to respond
promptly to a possible medical emergency. Undue concern
with Fourth Amendment niceties could yield a dead victim
who might otherwise have survived.

In *Wayne v. United States,* 318 F.2d 205 (D.C.Cir.1963),
Judge Warren E. Burger (later Chief Justice of the United
States) articulated this overarching but often overlooked fact
of police life:

> [A] warrant is not required to break down a door to enter
> a burning home to rescue occupants or extinguish a fire, to
> prevent a shooting or to bring emergency aid to an injured
> person. The need to protect or preserve life or avoid
> serious injury is justification for what would be otherwise
> illegal absent an exigency or emergency. Fires or dead
> bodies are reported to police by cranks where no fires or
> bodies are to be found. Acting in response to reports of
> "dead bodies," the police may find the "bodies" to be
> common drunks, diabetics in shock, or distressed cardiac
> patients. *But the business of policemen and firemen is to
> act, not to speculate or meditate on whether the report is
> correct. People could well die in emergencies if police tried
> to act with the calm deliberation associated with the judi-
> cial process.* Even the apparently dead often are saved by
> swift police response. A myriad of circumstances could fall
> within the terms "exigent circumstances" * * *, *e.g.,* smoke
> coming out a window or under a door, the sound of gunfire
> in the house, threats from the inside to shoot through the

door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

(Emphasis supplied). *See also State v. Hetzko*, 283 So.2d 49 (Fla.App.1973) (the question is whether "the officers would have been derelict in their duty had they acted otherwise"); *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990) (entry proper, as "had the police officers failed to enter the home to determine the well-being of the children, they may well have been derelict in their duty").

With abundant case law cited for each example given, Professor LaFave, at 396–400, has listed a large number of the diverse circumstances that would fall within the general category of community caretaking:

> *Doubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made* to thwart an apparent suicide attempt; to rescue people from a burning building; to seek an occupant reliably reported as missing; to seek a person known to have suffered a gunshot or knife wound; to assist a person recently threatened therein to retrieve his effects; *to seek possible victims of violence in premises apparently burglarized recently;* to assist a person within reported to be ill or injured; to rescue a person being detained therein; to assist unattended small children; to ensure a weapon within does not remain accessible to children there; to respond to what appears to be a fight within; or to check out an occupant's hysterical telephone call to the police, screams in the dead of the night, or an inexplicably interrupted telephone call from the premises. *Entry may be justified even though the endangered persons are not in the premises,* as where police entered premises in an attempt to discover what substance might have been eaten by several children who were critically ill.

(Emphasis supplied; footnotes omitted).

In *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978), the Supreme Court observed:

We do not question the right of the police to respond to emergency situations. *Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.* Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.

(Footnotes omitted; emphasis supplied). *Cf. Michigan v. Tyler,* 436 U.S. 499, 509–10, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Thompson v. Louisiana,* 469 U.S. 17, 20–21, 105 S.Ct. 409, 410–11, 83 L.Ed.2d 246, 250–51 (1984).

The Maryland case law is in complete accord. For an extended analysis of the various situations in which essentially non-investigative police conduct should be judged by the general reasonableness standard, see the excellent opinion by Judge Smith in *Lebedun v. State,* 283 Md. 257, 259–78, 390 A.2d 64 (1978).

*Davis v. State,* 236 Md. 389, 204 A.2d 76 (1964), was also a case in which the Court of Appeals used the general reasonableness standard to assess the propriety of a warrantless entry into a defendant's home, when the purpose of that entry was to render aid to a possibly stricken victim of violence. After having discovered one homicide victim in the backyard of the premises, a police lieutenant "walked from the backyard where the deceased had been found to the front of the house, where he knocked on the door. Receiving no response, he looked into the window located to his left as he faced the door and noticed a pair of human feet." 236 Md. at 393, 204 A.2d 76. The lieutenant then entered the house through an unlocked kitchen door. What he found was the defendant sleeping on a couch and other evidence linking the defendant to the homicide. The Court of Appeals, speaking through Judge Marbury, held that under the circumstances the warrantless entry of the home was reasonable:

We find that the entrance of the police officers into the house was reasonable under the circumstances then existing in order to determine whether the feet which were seen therein by Lt. Denell were those of a person in distress, immediate aid to whom might, under similar circumstances, have preserved a human life. *Basic humanity required that the officers offer aid to the person within the house on the very distinct possibility that this person had suffered at the hands of the perpetrator of the homicide discovered in the back yard.* The delay which would necessarily have resulted from an application for a search warrant might have been the difference between life and death for the person seen exhibiting no signs of life within the house. The preservation of human life has been considered paramount to the constitutional demand of a search warrant as a condition precedent to the invasion of the privacy of a dwelling house.

236 Md. at 395–96, 204 A.2d 76 (emphasis supplied). The analysis was not framed in terms of probable cause.

In *Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992), as in this case, observations made during the initial warrantless entry of the defendant's home by the police led to the issuance of a search warrant for that home. There, as here, the defendant moved to suppress the evidence on the ground that the warrant, based as it was on the earlier observations, was the fruit of the poisoned tree. There, as here, the police had come to the appellant's residence in response to a radio dispatch regarding a "suspicious condition" at the residence.

Arriving at the scene, a police sergeant spoke to a woman who reported that she had reason to believe that her sister was "missing," that harm had come to the sister, and that she (the woman speaking to the sergeant) had come to the defendant's house to check on her missing sister. She found no one at home, the door to the house "ajar," and she then entered the house. She found the house in disarray and blood on the floor near the entrance. There was no apparent inquiry by the sergeant as to why the woman believed her sister might have been in the defendant's home. Based on that report, the

police warrantlessly entered the house for the primary purpose of locating and attending to a possible victim of violence. In affirming the decision of the trial judge that the warrant was not tainted by observations made during an improper entry, the Court of Appeals held that the initial police "decision to enter Oken's home was both reasonable and justifiable." 327 Md. at 646, 612 A.2d 258. The analysis was not framed in terms of probable cause.

This Court did not hesitate to hold that police at an accident scene, as part of their community caretaking function, may enter the otherwise constitutionally protected interior of an automobile to come to the aid of an injured occupant. *Ciriago v. State,* 57 Md.App. 563, 569–70, 471 A.2d 320 (1984).

In *Burks v. State,* 96 Md.App. 173, 195–98, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993), this Court approved, as inherently reasonable, the warrantless entry by the police into a motel room to rescue two kidnapping victims. In a secondary sense, the entry was self-evidently investigative in that the kidnapper was apprehended *in flagrante delicto* in the motel room that was warrantlessly entered. That, however, did not make the entry the occasion for a probable-cause inquiry. The primary and "non-investigatory" purpose of the entry, by contrast, was to come to the aid of two endangered victims. At trial, Judge Hollander had "ruled that the police satisfied the Fourth Amendment merits by *searching and seizing in a reasonable manner.*" (Emphasis supplied). 96 Md.App. at 195, 624 A.2d 1257. This Court affirmed that "ruling that *the warrantless entry into the motel room was reasonable.*" (Emphasis supplied) 96 Md.App. at 198, 624 A.2d 1257.

### Protecting Property

A second broad sub-category of the police community caretaking function, frequently overlapping that of coming to the assistance of possible victims, is the protection of property. The necessity of entering otherwise protected premises in order to protect property occurs most frequently in the context of the police discovery of circumstances indicating that a

burglary or a breaking and entering has recently occurred or is then occurring. Professor LaFave, § 6.6(b) at 403–05, well described this aspect of the community caretaking function:

> Police may also enter private property for the purpose of protecting the property of the owner or occupant or some other person. *One possibility is where the police reasonably believe that the premises have recently been or are being burglarized.* Thus, police entry is justified on the basis of a breaking and entering call to police plus the discovery of an open door which bore evidence of being pried open, of activation of a burglar alarm at those premises, of the observation of lights on within and strange cars parked about a house whose occupants a neighbor says are on vacation, and of a neighbor's report that strangers were seen coming from a cabin in an area where many cabins had recently been broken into. By the same reasoning, it would seem that police entry is justified where persons possibly intent upon vandalism are reported by a neighbor to have entered a vacant house. Indeed, entry would be permissible when commercial premises are found to be unlocked and unattended in the evening hours.

(Emphasis supplied).

In *Commonwealth v. Fiore*, 9 Mass.App.Ct. 618, 403 N.E.2d 953 (1980), the police had a reasonable basis for believing that a burglary had occurred or was then occurring. In holding legitimate the warrantless entry of a home, the Massachusetts Court of Appeals observed, 403 N.E.2d at 954–55:

> It seems clear to us that *a house break without more*—as set out in the affidavit—*raises the possibility of danger to an occupant and of the continued presence of an intruder and indicates the need to secure the premises.* In such circumstances "[t]he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers."

(Emphasis supplied).

In many of the examples provided by the supporting case law, there was, to be sure, some evidence of tampering or

breaking included in the police observations. The appellees, indeed, make much of the absence of evidence of such forcible breaking. In this case, however, that factor can be largely discounted. The expertise of an experienced officer as to the *modus operandi* of criminals in his neighborhood is entitled to significant weight. In this case, Deputy Sheriff Naughton was familiar with the rash of breakings and enterings that had been occurring in the Ranch Club area where the appellees' home was located. Deputy Naughton testified that in none of those cases was there any sign of a forced entry other than an open door and that what he observed at the appellees' home was completely consistent with the other burglaries that had recently occurred in that neighborhood.

In *People v. Parra,* 30 Cal.App.3d 729, 106 Cal.Rptr. 531 (1973), the police were, to be sure, protecting a commercial premises rather than a residence. When they found it unlocked and unattended and the door slightly ajar during the evening hours, they entered in order to protect the property and to provide for its security. In affirming the reasonableness of the entry, the California Court of Appeals stressed the essential reasonableness of the police conduct under circumstances where there was no suggestion of subterfuge:

> There is nothing in the record to suggest that the officers entered the retail business establishment for any purpose other than to provide for its security. To paraphrase § 197 of the Restatement of Torts (2d ed.), *one is privileged to enter and remain on land in the possession of another if it reasonably appears to be necessary to prevent serious harm to the land or chattels of the other party, unless the actor has reason to know that the one for whose benefit he enters is unwilling that he should take such action.* * * * According to the uncontradicted and credible evidence before the trial court, the officers entered the Alpar Florist Shop to protect the shop and its contents. Their presence in the shop was privileged.

(Emphasis supplied). Let it be repeated that in this case there was no remote suggestion of any police subterfuge.

## The Dual Purpose of Protecting Persons and Property

Although the case law attaches slightly greater weight to the protection of persons from harm than to the protection of property from theft, many of the cases involving possible burglaries or breakings and enterings stress the dual community caretaking purpose of protecting both. *Carter v. State,* 405 So.2d 957 (Ala.Crim.App.1981) (immediate entry lawful "to be certain there was no injured, disabled, or dying victim"); *State v. Carroll,* 97 Md.App. 234, 629 A.2d 1247 (1993) ("an apparent housebreaking, either in progress or recently committed, constitutes exigent circumstances," in part "to ascertain whether there are victims in need of assistance"); *Commonwealth v. Fiore,* 9 Mass.App.Ct. 618, 403 N.E.2d 953 (1980) (immediate warrantless entry lawful because of "the possibility of danger to an occupant"); *In re Forfeiture of $176,598,* 443 Mich. 261, 505 N.W.2d 201 (1993) (entry "at the scene of an apparent breaking and entering" necessary because the "intruders may have restrained or, worse yet, injured or killed the inhabitants").

When conducting a search for potential burglars, moreover, the scope of the police officer's search is as broad as the underlying objective of the search. Professor LaFave explained:

> Assuming the police are lawfully on the premises for the purpose of protecting property, they may take appropriate steps consistent with that purpose. If it is possible the burglar is still at the scene, the police may look in places where he might be hiding.

Section 6.6(b) pp. 406–07 (footnote omitted); *see also State ex rel Zander v. District Court,* 180 Mont. 548, 591 P.2d 656 (1979) (search for potential burglary suspect in closet permissible and discovery of narcotics therein admissible under plain view doctrine).

## The Reasonable Basis Standard for Assessing Community Caretaking

When the police cross a threshold not in their criminal

investigatory capacity [2] but as part of their community care-taking function, it is clear that the standard for assessing the Fourth Amendment propriety of such conduct is whether they possessed a reasonable basis for doing what they did. Professor LaFave explained that the concern is with the basic reasonableness of an officer's belief that it is necessary to act:

> "An objective standard as to the reasonableness of the officer's belief must be applied." Thus, *the question is whether there were "reasonable grounds to believe that some kind of an emergency existed," that is, whether there is "evidence which would lead a prudent and reasonable official to see a need to act." The officer must "be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion."*

(Footnotes omitted; emphasis supplied). *See also Oken v. State,* 327 Md. 628, 646, 612 A.2d 258 (1992); *Lebedun v. State,* 283 Md. 257, 259–78, 390 A.2d 64 (1978); *Davis v. State,* 236 Md. 389, 395, 204 A.2d 76 (1964); and *cf. Stanberry v. State,* 343 Md. 720, 742–43, 684 A.2d 823 (1996).

▆ The inappropriateness of the probable cause standard for reviewing anything other than the criminal investigatory function has been made clear by the Supreme Court in a

---

**2.** A note of caution is in order about our use of the term "non-investigatory capacity." When in the context of a possible burglary or breaking and entering, the police enter a home or other structure in order to come to the aid of a possibly injured or threatened owner or to protect the property of that owner, they are, in one sense of the term, quite obviously investigating the possibility that a crime has occurred. Their purpose *vis-a-vis* the burglar they may catch is, of course, "investigatory."

With respect, on the other hand, to the presumably innocent victims of possible crimes, where persons and/or property are in apparent danger, the police intervention is "non-investigatory" in its purpose and the constraints and hesitation that routinely inhibit a criminal investigation are inappropriate. *Burks v. State,* 96 Md.App. 173, 195–98, 624 A.2d 1257 (1993). If a Secret Service agent tackles the President to remove him from the path of a would-be assassin's bullet, the propriety of that tackle will be viewed by a different standard than that which will be applied to his subsequent tackle of the apparent assailant attempting to flee the scene.

number of contexts. Even when the person subjected to a Fourth Amendment intrusion is the actual target of the inquiry, if the purpose is not *per se* to discover evidence of crime but is intended to serve some "special need beyond the investigative norm," what is constitutionally required is simply general reasonableness or articulable suspicion. In the context of investigating not the perpetration of a crime but the violation of a school regulation, the invasion of a suspected student's Fourth Amendment rights was assessed only in terms of general reasonableness, not probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720, 734 (1985), held:

> [W]e have in a number of cases recognized the legality of searches and seizures based on suspicions that, although "reasonable," do not rise to the level of probable cause. Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.
>
> We join the majority of courts ... in concluding that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, *the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.*

(Emphasis supplied; citations omitted). Although the search was not looking for evidence of crime, it turned up evidence of crime.

*O'Connor v. Ortega,* 480 U.S. 709, 725–26, 107 S.Ct. 1492, 1502, 94 L.Ed.2d 714, 728 (1987), applied the same general reasonableness standard in evaluating the search of the private desk of a psychiatrist to discover evidence of occupational misfeasance:

[W]e conclude that the "special needs, beyond the normal need for law enforcement make the ... probable-cause requirement impracticable" for legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct.... We hold ... that *public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances.*

(Emphasis supplied; citation omitted).

*Griffin v. Wisconsin,* 483 U.S. 868, 878, 107 S.Ct. 3164, 3171, 97 L.Ed.2d 709, 720 (1987), applied the general reasonableness standard to the search of a probationer's home looking for evidence of a probation violation:

We think that the probation regime would also be unduly disrupted by a requirement of probable cause.

Although the search was not looking for evidence of crime, it turned up evidence of crime.

If probable cause is not required to intrude on the Fourth Amendment rights of one who is actually the target of an investigation into some form of misconduct, albeit less than criminal misconduct, *a fortiori,* it is not required to come to the possible aid and protection of one who is not a target of any sort.

It has also regularly been held that general reasonableness rather than a warrant or probable-cause requirement is the appropriate standard when government investigators are searching for violations of administrative infractions in closely regulated industries. *Camara v. Municipal Court,* 387 U.S. 523, 538, 87 S.Ct. 1727, 1735–36, 18 L.Ed.2d 930, 940–41 (1967); *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Marshall v. Barlow's,* Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

The general reasonableness standard has also been utilized to uphold the propriety of the required furnishing of blood, breath or urine to test for drugs or alcohol (unquestioned Fourth Amendment searches and seizures) of entire classes of persons even in the absence of any individualized or particularized suspicion. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Vernonia School District v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

Nothing in *Carroll v. State*, 335 Md. 723, 646 A.2d 376 (1994), suggests that general reasonableness is not the appropriate standard for assessing police behavior in a case such as this. In *Carroll*, the State advanced the community caretaking function as an alternative way of assessing the Fourth Amendment entry in that case. Because the Court held that **EVEN IF** the higher probable cause standard had applied it had been satisfied, it was unnecessary to decide whether the lesser standard was the more appropriate measuring device. Judge Raker squarely stated that the Court was taking no position with respect to the pertinent standard:

> [W]e need not address the State's argument with respect to the application of the "community caretaking function" exception to the warrant requirement to the facts of this case[.]

335 Md. at 740 n. 5, 646 A.2d 376.

### The Entry in this Case Was Reasonable

■ We do not hesitate to hold that the entry by two deputy sheriffs into 11541 Deadwood Drive at approximately 1 P.M. on November 27, 1997, was eminently reasonable. Corporal Koehn, who had been on routine patrol, responded to that address because he had been alerted to a "possible breaking and entering." The antecedent call to the Sheriff's Department Control Center had been placed not by an informant from the criminal milieu but by a presumptively reliable

neighbor, who while wishing to remain anonymous nonetheless gave his house address.

On arriving at Deadwood Drive, Corporal Koehn confirmed the neighbor's report that the basement door was "wide open." The initial report to the Control Center had contained, moreover, the informant's belief that the occupants of 11541 Deadwood Drive were away at the time. The fact that November 27 was Thanksgiving Day contributed to the officer's permitted inference that the occupants might well have been away from home either for the day or for a long weekend.

Neither Corporal Koehn nor Deputy Sheriff Naughton, who joined him at the scene, observed any signs of a forcible entry. Deputy Naughton explained, however, that in the rash of burglaries and breakings and enterings that had taken place in that neighborhood recently, there had generally been no signs of forcible entry and that the observations made at 11541 Deadwood Drive were completely consistent with what had been found at the sites of other crimes. We attach significance to the fact that there had been a series of recent burglaries in that very neighborhood. Although the appellees seek to dismiss that factor as trivial, this Court, speaking through Judge Robert Bell (now Chief Judge of the Court of Appeals), attached significance to just such a factor in *Timms v. State,* 83 Md.App. 12, 23, 573 A.2d 397 (1990):

> Here ... the police also knew the nature of the area and the fact that B & E calls were a frequent occurrence.

Even at that point, the two officers did not rashly enter the home. Corporal Koehn "hollered in the house" to determine "if anybody is home." In calling out, he announced that he was a representative of the Sheriff's Office. He received no reply. He walked around to the front of the house, knocked on the door, and rang the doorbell. Again, he received no reply, although he did hear a dog barking inside the house. Confirming his conclusion that no one was home, he observed that there were no vehicles parked in the driveway of the house.

As they entered the basement, the two officers were further alerted by the fact that the basement was in disarray. Limiting the scope of their intrusion meticulously to a sweep of the residence to determine if anyone was inside, the officers did not abuse that caretaking function by any more intensive prying. It was only when looking into a walk-in closet in the master bedroom, a place where an intruder could well have been hiding, that the officers saw marijuana on a shelf in plain view. Even then they did not seize it, as they well could have under the Plain View Doctrine exception to the warrant requirement, but secured the house and returned only under the authority of a judicially-issued search and seizure warrant. There was saliently missing from the circumstances of this case any possibility that the two officers were engaging in any sort of a subterfuge.

It was reasonable for them to fear that a burglary had recently taken place and that evidence of it might be found inside. There was a reasonable possibility that a criminal intruder might still be inside the home. Corporal Koehn, indeed, had expressed his own caution in that regard, as he explained why he waited for Deputy Naughton before proceeding further with his inspection of the premises. There was, moreover, the real possibility that the homeowners of 11541 Deadwood Drive had been injured by intruders or were at that very moment in some sort of distress.

Particularly in circumstances where there is no reason to be skeptical about the police exercise of their caretaking function because of any fear of subterfuge, the conduct of the two officers was exemplary. The appellees were not in any way suspected of being involved in any crime. The officers, who came to the scene only to be of assistance, had reason for being apprehensive that the appellees' home, the appellees' personal property, and possibly even the appellees themselves were in danger. Had the officers walked away from the scene, they would have been derelict in their duty.

We do not attach negative significance, as did the trial judge, to the fact that the officers checked no further with the

neighbor who was observing them from nearby. He may not have been the neighbor who made the initial call. Even if he were, the officers had already observed directly everything that the neighbor had passed on in his initial telephone call. We will not, moreover, fault the officers for being solicitous of the telephoning neighbor's legitimate desire to remain anonymous. What the officers did in this case was the quintessence of the reasonable performance of their community caretaking function.

## A Contingent Alternative Holding

As a purely precautionary note, we add that our reversal of the suppression order in this case is not dependent on our conclusion that the officers, when they initially entered 11541 Deadwood Drive, were engaged in a community caretaking function and that the appropriate Fourth Amendment standard for assessing such police behavior is that of general reasonableness. Even were we wrong with respect to the appropriate standard and even were probable cause to believe that a burglary had occurred or was then occurring the standard that had to be satisfied, our decision in this case would be the same.

With respect to the satisfaction of the probable cause standard, we find dispositive the decision of the Court of Appeals in *Carroll v. State*, 335 Md. 723, 646 A.2d 376 (1994). We find the circumstances in our case on the subject of probable cause to be at least as persuasive, and probably more persuasive, than those held to be adequate in *Carroll*.

### Carroll v. State

In *Carroll*, as in the case now before us, the defendant was convicted on the basis of marijuana found in the defendant's home when several deputy sheriffs executed a judicially-issued search and seizure warrant. In *Carroll*, as in this case, the defendant claimed that the warrant was tainted because the probable cause spelled out in the antecedent application depended on visual observations that had been made in the course of an earlier warrantless intrusion into the home in

violation of the Fourth Amendment. In *Carroll*, as in this case, the earlier warrantless intrusion had been made by the deputy sheriffs because of their belief that a burglary of the home had recently occurred or was then in progress. In *Carroll*, as in this case, the deputy sheriffs who were investigating the burglary inadvertently discovered marijuana in plain view. In *Carroll*, as in this case, they did not seize the marijuana under the Plain View Doctrine but secured the premises and used their observations as their basis for obtaining a search and seizure warrant. In *Carroll*, as in this case, the ultimate decision turned on the propriety of the earlier warrantless intrusion.

In *Carroll*, as in this case, the circuit court, at a pretrial suppression hearing, ruled that the initial entry was unreasonable and suppressed the evidence. In *Carroll*, as in this case, the State appealed the pretrial ruling. In *Carroll*, as we now do in this case, this Court reversed that suppression order of the trial court. *State v. Carroll*, 97 Md.App. 234, 629 A.2d 1247 (1993). In *Carroll*, the Court of Appeals affirmed the decision of this Court that the initial warrantless entry had not violated the Fourth Amendment. Finding it unnecessary to determine which of two alternative standards should be used to assess the initial police entry, the Court of Appeals held that even the more difficult probable cause standard had been satisfied. Under the circumstances, it was unnecessary to decide whether the lesser standard of general reasonableness was the appropriate standard to apply to the case.

In *Carroll*, the conclusion that the police were acting in their community caretaking capacity rather than in their investigatory capacity was far less compelling than it is in this case. That may well have been the reason the Court of Appeals deemed it prudent to resolve *Carroll* on the basis of the more stringent probable cause standard. To enter a home in order to protect the property or persons of the homeowners from a possible burglar is a classic instance of community caretaking. To enter a home, on the other hand, for the purpose of searching for a fugitive, particularly in circum-

stances where the homeowner may conceivably have been harboring or otherwise welcoming the fugitive, would clearly be a performance of the investigative function.

■ In our case, the police had no reason to suspect that 11541 Deadwood Drive might have contained either a criminal or evidence of crime until they routinely responded to a radio call to check out a "possible breaking and entering." In *Carroll,* by contrast, the Sheriff's Department was expressly attempting to locate and to arrest a recent escapee from Work Release at the Detention Center. The affidavit in support of the search warrant application simply gave the unilluminating conclusion that the police "believ[ed] that the suspect Hudson might be hiding there [the home in Eldersburg that was ultimately entered]." The officers went to that home not to check out a burglary but for the precise purpose of apprehending the fugitive believed to be hiding there.

There was no suggestion, moreover, that the fugitive had entered the home **AS A BURGLAR.** In terms of the inherent unlikelihood of such a conclusion, that is not the sort of information to which an informant would ordinarily be privy. Assuming the informant's information to have been correct, it is far more likely that the fugitive was in the home by some sort of pre-arrangement with the homeowner than as an uninvited invader. When the officers got to the residence, they checked with the occupant of the upstairs apartment, who informed them that the fugitive, "Hudson" by name, had, indeed, been in the downstairs apartment the night before "at approximately 11 P.M. but . . . had left." 335 Md. at 727, 646 A.2d 376. How would an upstairs neighbor have known **A BURGLAR** by name or have observed **A BURGLAR** leave the premises without calling the police? Further denigrating from the likelihood that the fugitive was still inside the home **AS A BURGLAR** was the improbability that a burglar would remain inside the burglarized premises for over thirteen hours. 335 Md. at 746 n. 2, 646 A.2d 376 (dissenting opinion by Judge Bell).

The presence of a plausible alternative theory diminished the likelihood that a burglary had been committed or was in progress in the *Carroll* case. In our case, by contrast, there was no affirmative evidence of an alternative theory pointing away from the possibility of a burglary. In *Carroll,* the holding that there was probable cause to believe that a burglary had been committed had to overcome the skepticism that the burglary rationale was a subterfuge in order to make a search for some other investigative purpose. In our case, by contrast, there was no hint of any other investigative purpose and, therefore, no skepticism to be overcome.

In terms of the physical evidence of a possible breaking, there is little difference between what was before the Court in *Carroll* and what is before us in this case. In our case, there were no signs of a forcible entry but the deputy sheriff explained that, as a common *modus operandi,* there were generally no signs of forcible entry in any of the rash of burglaries that had occurred recently in that neighborhood. In *Carroll,* one of four window panes in the basement door was missing. A "missing" window pane, however, is not as ominous as a broken window pane, particularly during the month of July.[3] In *Carroll,* the basement door was approximately two inches ajar. In our case, the basement door was wide open. There is little to choose between the two situations.

In terms of the possible danger to a victimized homeowner in need of immediate police intervention, the circumstances in our case are stronger than were those in *Carroll.* In our case, to be sure, the initial telephone call to the Control Center had expressed the telephoning neighbor's belief that the occupants of 11541 Deadwood Drive "were away." In *Carroll,* the upstairs neighbor asserted to the police as a fact that the occupant of the downstairs apartment "wouldn't be home until Saturday or Sunday." The police received that information at

---

3. This contrasts with the present case's wide open door during the far colder fourth week of November.

approximately noon on Friday when there was no one in apparent present peril.

The police actions immediately before making their respective warrantless entries were marginally more circumspect in our case than they were in *Carroll.* In our case, the police walked around to the front of the house, knocked on the door, rang the doorbell, and awaited a response, which was non-forthcoming. In *Carroll,* they took no such actions. In our case, the police "hollered in the house if anybody is home, Sheriff's Office" well before they ultimately entered. In *Carroll,* one of the officers "announced his presence" as he entered and then repeated the announcement after entering.

In *Carroll,* under what we believe to have been less compelling circumstances than were present in this case, the Court of Appeals affirmed the prompt and warrantless police intrusion:

> [W]e hold that the deputy sheriffs had the requisite probable cause and exigency to conduct the initial warrantless entry.

335 Md. at 739, 646 A.2d 376.

*A fortiori,* we hold that the deputy sheriffs in this case had the requisite probable cause (if such were needed) and exigency to conduct the initial warrantless entry.

\*    \*    \*    \*    \*    \*

Let it be carefully noted that we have added this final analysis pursuant to the probable cause standard only as a contingent and backup position. We adhere firmly to our belief that the police in this case were engaged in a community caretaking function and not in an investigative function and that the appropriate standard for judging such police behavior is that of general reasonableness.